I. INTRODUCTION
MURPHY, Circuit Judge.
An Oklahoma jury convicted Danny Hooks on five counts of first degree mur *719 del’ and imposed five death sentences. The Oklahoma Court of Criminal Appeals (“OCCA”) affirmed the convictions and death sentences, Hooks v. State, 19 P.3d 294, 319 (Okla.Crim.App.2001), and denied post-conviction relief, Hooks v. State, 22 P.3d 231, 233 (Okla.Crim.App.2001). Hooks then filed a 28 U.S.C. § 2254 habeas corpus petition, challenging his convictions and death sentences. The district court denied relief. Hooks appeals to this court, raising four claims: (1) trial counsel was ineffective during the guilt and penalty phases of trial; (2) prosecutorial misconduct denied him a fair sentencing proceeding; (3) an Allen charge[1] given during penalty-phase deliberations coerced the jury into returning death sentences; and (4) the cumulative impact of these errors denied him a fundamentally fair sentencing proceeding.[2]
Hooks has failed to demonstrate that the OCCA’s resolution of his claim of ineffective assistance of trial counsel during the guilt phase is contrary to or an unreasonable application of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). 28 U.S.C. § 2254(d)(1). Furthermore, the record makes clear that all aspects of this claim raised for the first time in Hooks’s habeas petition fail on the merits. Id. § 2254(b)(2). Accordingly, this court affirms the denial of habeas relief on the murder convictions. Nevertheless, the Allen charge given by the trial court in the midst of penalty-phase deliberations, when considered in the context of all surrounding circumstances, coerced the jury into returning death sentences. Furthermore, the OCCA’s decision to the contrary is an unreasonable application of Lowenfield v. Phelps, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988). 28 U.S.C. § 2254(d)(1). Accordingly, this court reverses and remands to the district court to grant habeas relief to Hooks on each of his five death sentences.[3]
II. BACKGROUND
The relevant underlying historical facts were outlined by the OCCA in its opinion on direct appeal:
On May 16,1992, the bodies of Phyllis Adams, LaShawn Evans, Sandra Thompson, Carolyn Watson, and Francill Roberts were found in a small bedroom in a crack house. Each woman was gagged and had been stabbed several times. The bodies were nude and Thompson, Watson, and Roberts were bound. [Adams was partially clothed but her brassiere and shirt were pulled up, exposing her chest area. Evans and Adams were not bound, but evidence suggested at one time Adams’s hands had been tied.] The room was in disarray and the victims’ purses appeared to have been searched. There were no drugs or money in the house.
Although there were five victims in a confined space, the evidence suggested *720 one person committed the crimes. The women were killed in the bedroom. A trail of blood drops led to the front door, and Luminol testing showed a single set of bloody footprints also leading from the bedroom to the front door. There was a great deal of the victims’ blood in the bedroom. However, the blood trail to the door, and some other blood drops found at various places in the bedroom, did not come from any of the victims. A bloody palm print was on the west wall of the bedroom closet, and police found a bloody boot print with “Honchos” embossed on the sole. Despite a thorough investigation police found nobody who matched either the palm print or the blood drops. In 1995 samples of the blood drops were submitted for DNA testing, and those results were distributed nationally in 1996. In 1997, California penal authorities informed the Oklahoma State Bureau of Investigation (OSBI) that they had a person with that DNA profile. Subsequent tests confirmed that the blood trail, drops in the bedroom, and bloody palm print all belonged to Hooks. DNA from semen found in Roberts’s mouth was also consistent with Hooks’ DNA.
Hooks admitted he was at the house. He testified he went there during the evening of May 15th, and sometime close to or shortly after midnight on May 16th he was there smoking crack cocaine with all the victims. Hooks said he only knew the woman who rented the house, and could not remember any of the victims’ names. He said he had “regular” sex with one woman and oral sex with another. During the night they ran out of crack and Hooks gave two of the women $30 to go buy more. After they returned and finished smoking, he ran out of drugs and money and left. Hooks said he got home — about a mile from the house — around 2:00 a.m. He decided to go back sometime after 4:00 a.m. On the way, he cut his left index finger falling off his bicycle while trying to fix the kick stand. When he got there the house was dark and the door was ajar. He pushed it open and entered cautiously, closing the door behind him, went to the bedroom and saw the bodies, and went back to the front door. He lifted the curtain and looked outside, then decided to go back in and check on the victims in case anyone was alive. He returned to the bedroom and determined each victim was dead. After he checked Evans’s body he picked up a shirt and wrapped it around his cut finger. Hooks looked at the contents of the victims’ purses on the west bed, then knelt and looked under the clothes in the closet. He then left the house, dropping the shirt by the front door, and closed the door. Hooks did not tell anyone what he had seen because he was afraid the authorities would revoke his California parole for being in a crack house. Two weeks later he left the area. In November he was arrested in Holden-ville, Oklahoma, on a domestic complaint and returned to California.
Hooks, 19 P.3d at 303-04 & n. 2. Additional historical or procedural facts necessary to the resolution of this appeal are set out more fully below.
III. AEDPA STANDARD
This court’s review is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (“AEDPA”). Snow v. Sirmons, 474 F.3d 693, 696 (10th Cir.2007). With certain exceptions noted below, each claim Hooks raises on appeal was resolved on the merits by the OCCA. Accordingly, this court may not grant habeas relief on any such claim unless the decision of the OCCA “was contrary to, or involved an unreasonable application of, clearly estab *721 lished Federal law, as determined by the Supreme Court of the United States.” 28 U.S.C. § 2254(d)(1).
Under the “contrary to” clause, we grant relief only if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Court has on a set of materially indistinguishable facts. Under the “unreasonable application” clause, relief is provided only if the state court identifies the correct governing legal principle from the Supreme Court’s decisions but unreasonably applies that principle to the facts of the prisoner’s case.
Gipson v. Jordan, 376 F.3d 1193, 1196 (10th Cir.2004) (quotations, alterations, and footnote omitted). As these standards make clear, “[w]hen reviewing a state court’s application of federal law, we are precluded from issuing the writ simply because we conclude in our independent judgment that the state court applied the law erroneously or incorrectly.” McLuckie v. Abbott, 337 F.3d 1193, 1197 (10th Cir.2003). “Rather, we must be convinced that the application was also objectively unreasonable.” Id.
Th[e] question is not wh[at] the trial judge should have [done.] It is not even whether it was an abuse of discretion for her to have done so — the applicable standard on direct review. The question under AEDPA is instead whether the determination of the [State] Supreme Court ... was “an unreasonable application of ... clearly established Federal law.” [28 U.S.C. § ] 2254(d)(1). We have explained that “an unreasonable application of federal law is different from an incorrect application of federal law.” Indeed, “a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.” Rather, that application must be “objectively unreasonable.” This distinction creates “a substantially higher threshold” for obtaining relief than de novo review. AEDPA thus imposes a “highly deferential standard for evaluating state-court rulings,” and “demands that state-court decisions be given the benefit of the doubt.”
Renico v. Lett, — U.S. -, 130 S.Ct. 1855, 1862, — L.Ed.2d-(2010) (citations omitted).
It is important to note, however, that “[t]his standard does not require ... abject deference, but nonetheless prohibits us from substituting our own judgment for that of the state court.” Snow, 474 F.3d at 696 (quotations and footnote omitted). As the Supreme Court has made clear,
Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief. A federal court can disagree with a state court’s ... determination and, when guided by AEDPA, conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence.
Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003); see also Miller-El v. Dretke, 545 U.S. 231, 240, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005) (holding the AEDPA “standard is demanding but not insatiable”).
IV. GUILT-PHASE INEFFECTIVE ASSISTANCE OF COUNSEL

A. Background

On direct appeal, Hooks alleged his trial counsel was ineffective. As a general matter, his claim revolved around the conten *722 tion counsel was unprepared for trial and, therefore, failed to present an adequate defense to the murder charges. Hooks briefed the following specific claims of ineffective assistance before the OCCA: (1) trial counsel’s closing was insufficient in that it failed to marshal the evidence supporting Hooks’s version of events on the night of the murders; (2) trial counsel failed to timely request from Hooks’s family the work boots he customarily wore at the time of the crime, thereby precluding their use at trial to oppose the theory Hooks left the bloody “Honcho” boot prints at the crime scene; (3) trial counsel failed to object to egregious instances of prosecutorial misconduct; and (4) trial counsel failed to move in limine to exclude Hooks’s prior convictions for rape and assault and was, therefore, forced to elicit that evidence himself at the beginning of Hooks’s testimony in an effort to remove its sting if introduced by the prosecution during cross-examination.[4] After setting out the Strickland standard and noting trial counsel was less than a “zealous advocate,” the OCCA rejected on the merits each discrete claim of ineffective assistance of counsel set out in Hooks’s direct-appeal brief. Hooks, 19 P.3d at 317-18.
Hooks reasserted in his federal habeas petition that trial counsel was constitutionally ineffective. Unfortunately, his petition is far from a model of specificity. Instead, it begins with a generalized assertion that trial counsel’s lack of investigation and preparation prevented the presentation of a viable defense theory during the guilt phase of the trial. It then sets out a summary listing of trial counsel’s failures in this regard: (1) failure to contact prosecution witnesses in advance of trial; (2) failure to engage in meaningful pre-trial motions practice; (3) failure to timely obtain Hooks’s work boots; (4) deferring opening statement until the beginning of the defense’s case and then making an inadequate opening statement; and (5) failure to present the jury with a viable theory of the case during closing argument. Hooks also sought an evidentiary hearing to develop his claim of ineffective assistance.[5]
*723 The district court denied habeas relief on this claim. It began by discrediting, as inconsistent with the record, the contention that trial counsel had undertaken so little investigation and preparation that he was forced to proceed to trial with no strategy for dealing with the prosecution’s case. The district court moved on to note that many of the examples of ineffective assistance identified by Hooks had been resolved on the merits by the OCCA consistent with the standards set out in-Strickland. The district court rejected on the merits the ineffective assistance claim set out in the amended § 2254 petition, concluding the serology evidence relied on by Hooks did not negate his guilt and did not alter
the fact that trial counsel was faced with the necessity of explaining why [Hooks] was in the house and how his blood was found at the scene. Even had counsel presented testimony consistent with Dr. Allen’s opinions, he would still have been faced with the almost certain necessity of [Hooks] testifying in order to offer an explanation to the jury for the existence of this and other evidence. [Hooks’s] defense rested on the believability of his versions of the events and his credibility with the jury.
Finally, the district court denied Hooks’s request for an evidentiary hearing, noting that in analyzing the claim of ineffective assistance, it had considered all additional evidence Hooks adduced during the federal habeas proceedings. Even considering that additional evidence, the district court concluded the record conclusively established Hooks was not entitled to habeas relief.

B. .Analysis

On appeal to this court, Hooks raises the following claims of guilt-phase ineffective assistance of trial counsel: (1) failure to investigate; (2) failure to perform pre-trial motions practice; (3) failure to timely offer his work boots; (4) failure to offer forensic evidence; (5) and deferral of opening statement.[6] Hooks further claims the district court erred when it denied his request for an evidentiary hearing.
To prevail on a claim of ineffective assistance, Hooks must show his counsel’s performance “fell below an objective standard of reasonableness” and “the deficient performance prejudiced the defense.” Strickland, 466 U.S. at 687-88, 104 S.Ct. 2052. Review of counsel’s performance under Strickland’s first prong is highly deferential: “counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.” Id. at 690, 104 S.Ct. 2052. To be deficient, the performance must be “outside the wide range of professionally competent assistance.” Id. In other words, “it must have been completely unreasonable, not merely wrong.” Boyd v. Ward, 179 F.3d 904, 914 (10th Cir.1999); see also Strickland, 466 U.S. at 687, 104 S.Ct. 2052 (holding that to demonstrate deficient performance, a petitioner must show “counsel made errors so serious that counsel was not functioning as the ‘counsel’ guaranteed [a] defendant by the Sixth Amendment”).
*724 As for Strickland’s prejudice prong, Hooks must establish that but for counsel’s errors, there is a reasonable probability “the result of the proceeding would have been different.” 466 U.S. at 694, 104 S.Ct. 2052. That is, Hooks must show “counsel’s errors were so serious as to deprive [him] of a fair trial, a trial whose result is reliable.” Id. at 687, 104 S.Ct. 2052. Establishing a reasonable probability of a different outcome requires something less than a showing “counsel’s deficient conduct more likely than not altered the outcome in the case.” Id. at 693, 104 S.Ct. 2052. Instead, a reasonable probability is one “sufficient to undermine confidence in the outcome.” Id. at 694,104 S.Ct. 2052.
If Hooks is unable to show either “deficient performance” or “sufficient prejudice,” his claim of ineffective assistance necessarily fails. Id. at 700, 104 S.Ct. 2052. Thus, it is not always necessary to address both Strickland prongs. In particular, if Hooks is unable to satisfy his burden under Strickland’s prejudice prong, it is unnecessary to determine whether counsel’s performance was deficient. Id. at 697, 104 S.Ct. 2052. In undertaking a Strickland analysis of Hooks’s claims, this court keeps the AEDPA standards of review firmly in mind. See supra Section III. (setting out AEDPA standards); Wiggins v. Smith, 539 U.S. 510, 520-23, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (undertaking Strickland analysis against backdrop of AEDPA standards).

1. Failure to Investigate and Prepare

Hooks begins his briefing with a generalized assertion counsel failed to adequately investigate and prepare for trial. Hooks asserts counsel’s conduct “verges” on the absence of representation identified as grounds for relief in United States v. Cronic, 466 U.S. 648, 659, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). A review of his brief on direct appeal demonstrates Hooks did not raise a Cronic claim before the OCCA. It is likewise unclear whether Hooks raised a Cronic claim before the district court. Nevertheless, because it is abundantly clear Hooks is not, as a matter of law, entitled to relief under Cronic, we resolve this claim on the merits. 28 U.S.C. § 2254(b)(2) (providing federal habeas court can deny unexhausted claims on the merits).
In Cronic, the Supreme Court identified three situations when Strickland does not apply but the Court will, instead, presume prejudice without inquiring into counsel’s performance. 466 U.S. at 658-59, 104 S.Ct. 2039. Hooks invokes the second situation identified in Cronic: a presumption of prejudice is warranted if “counsel entirely fails to subject the prosecution’s case to meaningful adversarial testing.” Id. at 659, 104 S.Ct. 2039. The Court has made clear, however, that this exception to Strickland will apply only in the narrowest and rarest of circumstances: “When we spoke in Cronic of the possibility of presuming prejudice based on an attorney’s failure to test the prosecutor’s case, we indicated that the attorney’s failure must be complete.” Bell v. Cone, 535 U.S. 685, 696-97, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002). Consistent with this statement, the Court has indicated an alleged failure to adduce evidence and a decision to waive closing argument must be analyzed under Strickland, rather than under the rubric set out in Cronic. Bell, 535 U.S. at 697, 122 S.Ct. 1843; see also Patrasso v. Nelson, 121 F.3d 297, 302 (7th Cir.1997) (rejecting argument Cronic should apply because of “the magnitude of [counsel’s] multiple failures,” and holding instead that “where ineffectiveness is due to the attorney’s lack of preparation or skill ... Strickland rather than Cronic applies”).
*725 Because the record in this case demonstrates trial counsel did not “fail[] to oppose the prosecution throughout the [trial] as a whole,” Cronic does not apply. Bell, 535 U.S. at 697, 122 S.Ct. 1843; see also Hooks, 19 P.3d at 317-18 (noting trial counsel used the evidence presented at trial to argue the prosecution had not proven Hooks guilty of murder); infra Section rV.A.2.e. (discussing lack of prejudice flowing from trial counsel’s deficient opening statement). Accordingly, this court moves on to consider whether the specific acts or omissions identified by Hooks entitle him to relief under the standard set out in Strickland. See Strickland, 466 U.S. at 690, 104 S.Ct. 2052 (“A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment.”); Cronic, 466 U.S. at 666, 104 S.Ct. 2039 (holding that absent evidence “counsel failed to function in any meaningful sense as the Government’s adversary,” a petitioner can “make out a claim of ineffective assistance only by pointing to specific errors made by trial counsel”).

2. Pre-Trial Motion Practice

Hooks begins with a generalized assertion his trial counsel failed to engage in meaningful pre-trial motions practice. He then summarily identifies the following specific deficiencies: trial counsel failed to (1) file motions challenging the validity of the aggravating circumstances set out by the prosecution in support of the death penalty; and (2) file a motion in limine to exclude sexual proclivity evidence and evidence of Hooks’s prior criminal record.
As to the claim trial counsel was ineffective for failing to challenge the validity of the aggravating circumstances set out in the prosecution’s bill of particulars, we simply note this alleged failure does not relate in any way to the guilt phase of trial. Because, as set out more fully below, this court grants Hooks habeas relief as to his death penalties on the basis of the trial court’s Allen instruction, see infra Section V., we need not further consider this particular allegation of ineffective assistance.
As to the assertion trial counsel should have moved in limine to exclude evidence of his prior rape and assault convictions, we note the OCCA resolved this exact claim on the merits under the standards set out in Strickland. Hooks, 19 P.3d at 318. The OCCA concluded trial counsel was not ineffective for failing to seek to exclude the prior convictions because those convictions were admissible at trial for impeachment purposes pursuant to Okla. Stat. tit. 12, § 2609(A)(1). Hooks, 19 P.3d at 318.[7] Because Hooks does not *726 even address the merits of the OCCA’s decision, he has failed to demonstrate the OCCA’s resolution of this claim is an unreasonable application of Strickland. 28 U.S.C. § 2254(d)(1). In any event, because Hooks’s prior convictions were admissible as a matter of Oklahoma law, trial counsel did not perform deficiently when he raised the matter during direct examination in an effort to remove the sting of the evidence before the prosecution could develop it during cross-examination. Thus, Hooks is not entitled to habeas relief on this ground.
Hooks also asserts counsel was ineffective for failing to move in limine to exclude “sexual proclivity evidence” independent of the evidence relating to his past convictions. He does not, however, describe the evidence at issue, indicate on what basis it could have been excluded, or brief how it impacted his trial. Because the matter is only mentioned in passing and not briefed “with citations to the authorities and parts of the record on which [Hooks] relies,” Fed. R.App. P. 28(a)(9)(A), the issue is forfeited. Bronson v. Swensen, 500 F.3d 1099, 1104 (10th Cir.2007) (citing Rule 28(a)(9)(A) for the proposition this court has “routinely ... declined to consider arguments that are ... inadequately presented[ ] in an appellant’s opening brief’).

3. Failure to Produce Work Boots

At trial, the prosecution presented evidence indicating someone wearing “Honchos” work boots walked through blood at the crime scene, possibly while the victims were being killed. It further adduced evidence that during the period in question, Hooks normally wore work boots similar to the “Honchos” that left the print at the scene of the crime. In response to the prosecution’s focus on the “Honchos” boot print, trial counsel asked Hooks’s family to find his work boots.[8] Although a family member found the boots and brought them to the courthouse, the trial court excluded the evidence as a discovery sanction for not giving the boots to the prosecution during pre-trial discovery. On direct appeal, Hooks alleged (1) the trial court’s exclusion of the boots as a discovery sanction violated the Due Process Clause; and (2) trial counsel’s failure to obtain the boots and make them available during pre-trial discovery, thereby leading to their exclusion, amounted to ineffective assistance of counsel. Hooks, 19 P.3d at 306-07, 318.
The OCCA resolved these claims on the merits. As to the due process claim, the OCCA concluded the trial court erred in excluding Hooks’s boots as a discovery sanction. Id. at 306-07. It concluded, however, the error was harmless beyond a reasonable doubt because the prosecution connected Hooks to the crime through DNA and palm print evidence. Id. at 307. For that very same reason, the OCCA determined Hooks was not entitled to relief on his claim of ineffective assistance because he could not satisfy Strickland’s prejudice prong. Id. at 318; cf. Strickland, 466 U.S. at 694, 104 S.Ct. 2052 (holding that to satisfy the prejudice prong, a petitioner must establish that but for counsel’s errors, there is a reasonable probabil *727 ity the result of the proceeding would have been different).
On appeal to this court, Hooks asserts the admission of his work boots would have cast doubt on the prosecution’s contention one person committed the crime and would have lent credence to his assertion he arrived at the scene after the murders had already taken place. He further asserts the decision of the OCCA is unreasonable because it fails to adequately recognize the power of this rebuttal evidence. In response, Oklahoma merely quotes the opinion of the OCCA on direct appeal and asserts that decision is not an unreasonable application of Strickland.
The decision of the OCCA — that there is no reasonable probability the outcome of the guilt phase of Hooks’s trial would have been different if the boots had been admitted — is not unreasonable. See McLuckie, 337 F.3d at 1197 (holding this court can issue habeas writ only if state court’s application of Supreme Court precedent is objectively unreasonable). As recognized by the OCCA, the boot print was the least compelling evidence tying Hooks to the crime scene. Hooks, 19 P.3d at 307. In particular, the prosecution adduced evidence of a bloody palm print and a DNA match to blood at the crime scene. Id. Furthermore, Hooks did not contest his presence at the crime scene, but instead testified he was only present before and after the murders. Id. at 305-06.
This court’s review of the record demonstrates the prosecution’s boot print evidence was not nearly as significant as Hooks suggests. The “Honchos” boots admitted at trial were purchased by police at the time of the crime and were simply a demonstrative exhibit. Id. at 306. Although the prosecution asked the jury to infer the “Honchos” boot print came from Hooks because Hooks regularly wore work boots at the time of the crime, it does not appear the prosecution presented any evidence Hooks actually owned a pair of “Honchos” work boots. See id. Furthermore, trial counsel was successful during cross-examination in casting serious doubt on the value of the prosecution’s boot print evidence.[9] The prosecution did not even mention the boot prints until the rebuttal portion of its closing argument. Instead, it was defense counsel who first raised the matter in closing, pointing out all of the problems earlier identified with the prosecution’s assertion the “Honchos” boot prints belonged to the killer(s), let alone to Hooks.
In light of the record, the OCCA reasonably determined Hooks was not prejudiced by trial counsel’s failure to timely offer Hooks’s work boots. Strickland, 466 U.S. at 694, 104 S.Ct. 2052. Accordingly, Hooks is not entitled to habeas relief on this ground. 28 U.S.C. § 2254(d).
A Failure to Adduce Forensic Evidence
Hooks asserts the district court erred in denying habeas relief on his claim trial counsel was ineffective in failing to present forensic evidence discrediting serology evidence presented by the prosecution. The district court bypassed potential procedural impediments to Hooks raising this claim (i.e., anticipatory procedural bar and § 2244(d)’s limitations period) and resolved this claim on the merits pursuant to *728 § 2254(b)(2). It concluded Hooks had not suffered any prejudice from trial counsel’s failure to offer evidence like that set out in the Amended Petition because such evidence (1) did not negate guilt and (2) would not have altered the need for Hooks to explain to the jury how his blood came to be in the house where the murders occurred. Because it decided this matter in the first instance, unconstrained by the standard of review set out in the AEDPA, this court reviews the district court’s determination de novo. Young v. Sirmons, 551 F.3d 942, 970 (10th Cir.2008).
In asserting trial counsel was ineffective in failing to develop evidence challenging the prosecution’s serology evidence, Hooks relies on the affidavit of Dr. Robert Allen. Hooks argues Dr. Allen’s testimony substantiates his version of events and the absence of such evidence left his version of events entirely uncorroborated. This argument is based on a complete misreading of Dr. Allen’s affidavit. Hooks asserts Dr. Allen’s opinion supports the conclusion “that the blood evidence at the crime scene indicated more than one perpetrator.” Brief of Petitioner at 61. A close review of Dr. Allen’s affidavit, however, demonstrates it supports no such conclusion. Instead, the limited focus of Dr. Allen’s affidavit is as follows: the serology testing undertaken by forensic chemist Melissa Keith could not and did not exclude the possibility of other perpetrators. In reaching this conclusion, Dr. Allen relied on the following: (1) two potential suspects had blood profiles so similar to Hooks’s blood profile that they could not be excluded from the list of potential perpetrators without DNA analysis; and (2) up to thirty potential suspects had blood profiles similar to the five victims and Keith never undertook tests to analyze any blood evidence consistent with the blood profiles of the victims. Thus, testimony similar to Dr. Allen’s, if introduced at trial, would have demonstrated nothing more than the abstract possibility an unknown person left blood at the scene of the crimes.
Placed in its proper context, even assuming its truth, Hooks has failed to demonstrate a “reasonable probability of a different outcome” if trial counsel had adduced testimony at trial similar to that set out in Dr. Allen’s affidavit. Strickland, 466 U.S. at 694, 104 S.Ct. 2052. In reaching this conclusion, we have nothing to add to the district court’s cogent analysis:
Absent from Dr. Allen’s affidavit are any opinions contradicting [Hooks’s] DNA match with the “foreign blood” left at the scene. [Hooks’s] argument speculates that there were more than one perpetrators and that another perpetrator might have been a source for semen found in one of the victims and, had that perpetrator or another perpetrator bled at the scene, might possibly have been a source of blood serologically similar to one of the victims. Trial counsel was faced not with speculation, but with evidence of [Hooks’s] blood in the room with the victims’ bodies and also a blood trail through the house. [Hooks’s] palm print in blood was left at the closet. [The] Amended Petition and the accompanying affidavits do nothing to exonerate [Hooks] or negate the fact that trial counsel was faced with the necessity of explaining why [Hooks] was in the house and how his blood was found at the scene. Even had counsel presented testimony consistent with Dr. Allen’s opinions, he would still have been faced with the almost certain necessity of [Hooks] testifying in order to offer an explanation to the jury for the existence of this and other evidence. [The] defense rested on the believability of his versions of the events and his credibility with the jury. As determined by the OCCA, trial *729 counsel utilized the State’s evidence and [Hooks’s] testimony to argue the State had not proven [Hooks] was guilty.

5. Opening Statement

Hooks contends trial counsel provided ineffective assistance when he reserved his opening statement until the beginning of the defense’s case and then gave a “woefully brief and substance-lacking opening statement.” The record conclusively demonstrates Hooks suffered no prejudice as a result of this asserted instance of ineffective assistance. Thus, without regard to the question whether trial counsel’s opening statement was so deficient as to satisfy Strickland’s performance prong, Hooks is not entitled to habeas relief on this claim. 466 U.S. at 697, 104 S.Ct. 2052.[10]
In Oklahoma, the opening statement has a narrow purpose: “to inform the jury of the evidence the attorneys expect to present during the trial.” Young v. State, 12 P.3d 20, 36 (Okla.Crim.App. 2000); Hammon v. State, 898 P.2d 1287, 1306 (Okla.Crim.App.1995). An attorney is not allowed to argue the merits of the case during opening statements. Newsted v. State, 720 P.2d 734, 738 (Okla.Crim.App. 1986); see also Malicoat v. State, 992 P.2d 383, 394-95 & n. 10 (Okla.Crim.App.2000) (discussing difference in purposes of opening statement and closing argument). Thus, in analyzing whether Hooks was prejudiced by counsel’s delayed and allegedly inadequate opening statement, this court focuses on whether the jury was able to follow Hooks’s theory of the case absent the opening statement: Of. Malicoat, 992 P.2d at 394-95 (concluding nothing in the record indicated the “jurors were unable to understand or grasp the import of counsel’s cross-examination of State witnesses” in the absence of an opening statement by defense counsel at the beginning of trial).
Upon review of the trial transcript, this court is firmly convinced the jury’s understanding of, and ability to follow, the defense’s case was not hampered by trial counsel’s purportedly inadequate opening statement. The prosecution’s case, as outlined in its opening statement, was centered mostly around (1) forensic evidence tying Hooks to the murders, and (2) testimony of Sheila McClain, Hooks’s “main *730 girlfriend,” that Hooks was not at his house during the early morning hours when the murders occurred. As is clear from trial counsel’s cross-examination of prosecution witnesses, the defense theory was that McClain’s testimony was not credible[11]; there were serious problems with the prosecution’s forensic evidence[12]; and the prosecution’s theory that Hooks had, by himself, killed all five victims in a short time frame was unworthy of belief.[13] During his brief opening statement at the beginning of the defense’s case, trial counsel indicated Hooks would take the stand and relate to the jury what actually happened on the morning of the murders.
Having reviewed the entire record, it is apparent the case was not factually or conceptually difficult, turning narrowly on the credibility of McClain’s testimony and upon the persuasiveness of the state’s forensic evidence. That Hooks’s defense would contest those issues was clear from trial counsel’s cross-examination of prosecution witnesses. There is simply nothing in the record supporting Hooks’s assertion that the lack of an adequate opening statement hindered the jury’s ability to follow or understand the defense case. Cf. Mali-coat, 992 P.2d at 394-95. Accordingly, Hooks has failed to demonstrate any prejudice flowing from trial counsel’s allegedly deficient opening statement and is not entitled to relief under Strickland.

6. Evidentiary Hearing

Hooks asserts the district court erred in denying his request for an evidentiary hearing. In so asserting, he broadly contends such a hearing would establish trial counsel “failed to provide any reasonable advice or assistance” during the entire course of the proceedings following the pre-trial hearing and would include testimony from trial counsel and family members “who have personal knowledge of [trial counsel’s] unconscionable conduct.” [14] In denying Hooks’s re *731 quest for an evidentiary hearing, the district court concluded that even assuming the truth of Hooks’s factual assertions, he was not entitled to habeas relief. See Miller v. Champion, 161 F.3d 1249, 1253 (10th Cir.1998) (holding that under pre-AEDPA law a habeas petitioner is entitled to an evidentiary hearing “so long as his allegations, if true and if not contravened by the existing factual record, would entitle him to habeas relief’).[15]
“A district court’s decision to grant or deny an evidentiary hearing in a habeas proceeding is reviewed for an abuse of discretion.” Anderson v. Attorney General, 425 F.3d 853, 858 (10th Cir. 2005). Because, as set out fully above, each of Hooks’s claims of ineffective assistance of trial counsel is resolvable solely on the basis of the existing record, the district court did not abuse its discretion in denying Hooks’s general request for an evidentiary hearing. Miller, 161 F.3d at 1253. Likewise, the general and conclusory nature of the allegations in Hooks’s request for an evidentiary hearing, fully support the district court’s decision to deny that request. Hatch v. Oklahoma, 58 F.3d 1447, 1471 (10th Cir.1995), overruled in part on other grounds by Daniels v. United States, 254 F.3d 1180, 1188 n. 1 (10th Cir.2001) (en banc).
V. PENALTY-PHASE Allen INSTRUCTION

A Clearly Established Supreme Court Precedent

“The very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves.” Allen v. United *732 States, 164 U.S. 492, 501, 17 S.Ct. 154, 41 L.Ed. 528 (1896). This object is achievable only if individual jurors will “listen with deference to the arguments” of other jurors “with a distrust of [their] own judgment,” particularly when “a large majority of the jury tak[es] a different view of the case.” Id. at 501-02, 17 S.Ct. 154. For that very reason, the use of an Allen charge to encourage jury unanimity “has long been sanctioned” by the Supreme Court. Lowenfield, 484 U.S. at 237, 108 S.Ct. 546. The need for unanimity, however, is reduced in the context of penalty-phase proceedings because a deadlocked jury will not result in a mistrial. Okla. Stat. Ann. tit. 21, § 701.11 (providing that “[i]f the jury cannot, within a reasonable time, agree as to punishment, the judge shall dismiss the jury and impose a sentence of imprisonment for life” with or without parole); see also Lowenfield, 484 U.S. at 238, 108 S.Ct. 546 (recognizing identical feature of Louisiana law reduced need for unanimity, noting that fact “obviously weighs in the constitutional calculus,” but ultimately concluding it is not “dispositive”). Nevertheless, the state retains “a strong interest in having the jury express the conscience of the community on the ultimate question of life or death.” Lowenfield, 484 U.S. at 238, 108 S.Ct. 546 (quotation omitted). Thus, even in death-penalty proceedings, trial courts are entitled to direct juries to deliberate for a reasonable time before declaring a mistrial. Id.
Nevertheless, “[a]ny criminal defendant, and especially any capital defendant, being tried by a jury is entitled to the uncoerced verdict of that body.” Id. at 241, 108 S.Ct. 546. Accordingly, a trial court must be vigilant to instruct the jury in a way that, given all the surrounding circumstances, does not coerce the jury into returning a death verdict. Id. at 238-39, 108 S.Ct. 546 (noting that despite general propriety of encouraging additional deliberations through an Allen charge, Court was “naturally mindful ... that the qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed”). In resolving whether any particular Allen charge crossed over the boundaries of propriety to coercion, reviewing courts must “consider the supplemental charge given by the trial court in its context and under all the circumstances.” Id. at 237, 108 S.Ct. 546 (quotation omitted).
The dissent spills much ink arguing that the rule set out in Lowenfield is sufficiently general that this court’s review of the decision of the OCCA should be “ ‘doubly deferential.’ ” Dissenting Op. at 759 (citing Knowles v. Mirzayance, — U.S. -, 129 S.Ct. 1411, 1420, 173 L.Ed.2d 251 (2009)); see also id. at 756-59 (collecting cases). We have no reason to quibble with the dissent’s assertion.[16] On the other *733 hand, to the extent the dissent is asserting “double deference” is a synonym for “abject deference,” we simply note such an approach is precluded by this court’s decision in Snow, 474 F.3d at 696, and the Supreme Court’s decision in Miller-El, 537 U.S. at 340,123 S.Ct. 1029.

B. Background

1. Trial Proceedings

At the conclusion of the penalty-phase, the trial court instructed the jury it had the duty to impose sentence upon Hooks. The trial court listed for the jury the statutory aggravating circumstances at issue in the case, defined those aggravating circumstances, and instructed the jury it was authorized to consider imposing a sentence of death only if it first unanimously found beyond a reasonable doubt that one or more of those aggravating circumstances existed. The trial court defined the term “mitigating circumstances” and instructed the jury that “unanimous agreement of jurors concerning mitigating circumstances is not required.” The trial court instructed the jury as to its task during the selection phase of penalty deliberations[17] as follows:
If you unanimously find that one or more of the aggravating circumstances existed beyond a reasonable doubt, the death penalty shall not be imposed unless you also unanimously find that any such aggravating circumstance or circumstances outweigh the finding of one or more mitigating circumstances. Even if you find that the aggravating circumstances outweigh the mitigating circumstances, you may impose a sentence of imprisonment for life with the possibility of parole or imprisonment for life without the possibility of parole.
The trial court concluded with a catch-all instruction stating as follows:
All the previous instructions given you in the first part of this trial apply where appropriate....
You have already elected a foreperson. In the event you assess the death penalty, your verdict must be unanimous. You may also return a unanimous verdict of imprisonment for life without the possibility of parole or imprisonment for life with the possibility of parole---- When you have reached your verdict, all of you in a body must return it into open court.
*734 The law provides that you shall now listen to and consider the further arguments of attorneys.
Consistent with the concluding line of the trial court’s instructions, the case proceeded immediately to closing arguments. During those arguments, the prosecutors actively presented misleading statements to the jury as to the need for a unanimous verdict. The prosecution’s closing arguments were presented in two parts. The first part was presented by Brad Miller. Miller set about to mislead the jury as to its sentencing role by informing jurors (1) the jury’s work would be wasted if it failed to reach a unanimous verdict, (2) any argument by defense counsel that it took the vote of only one juror to prevent imposition of the death penalty amounted to a request for “jury nullification,” and (3) failure to deliberate in a manner leading to a unanimous verdict would amount to operating outside the law. Miller argued to the jury as follows:
It [sic] is certainly nothing easy about asking 12 strangers that don’t know each other to come into the room here and listen to all of this and end up with unanimity going in the same direction. It’s a tremendously difficult process and we know that.
But again, it’s the best system in the world. And it requires, though, these 12 people, these 12 strangers to come together and collaborate, discuss, make a decision. The system would actually grind to a halt. Think about it. It would grind to a screeching halt if juries didn’t come together and do that.
If we couldn’t depend on 12 citizens to come together and go in the same direction, then we would never have a verdict. There would never be a disposition. Defendants] would go back to jail and wait for the next trial and they’d go back to jail and wait for the next trial and no one would ever be acquitted and no one would ever be sent on to the penitentiary.
Now I suggest that [defense counsel] will probably say something to the affect [sic] that someone on this jury could hold up a decision. He will likely tell you that it just takes one person to stop all this. That is such a common argument down here that it’s got a name. It’s called jury nullification.
Nullification means an action impeding or attempting to prevent the operation or enforcement of the law. Websters. Nullification means an action impeding or attempting to prevent the operation of the law.
In other words, to nullify a jury, a jury’s job, a jury’s efforts really requires only convincing one or two people to cripple it, to stop it. And while I don’t want to beat this down I have got to tell you one more time that that’s not what we’re about. This system, and I remind you, is about deliberation. To do otherwise eviscerates the system. It cuts it up literally. It cuts it up. The very law that we live by. The 12 of you must resolve this case, all 12,1 suggest.
During his closing argument, defense counsel responded to Miller’s misstatements of the law by simply noting for the jury that the defense “will ask and tell [the jury] that it only takes one” because “that happens to be the law in Oklahoma.” Robert Macy then delivered the final segment of the prosecution’s closing argument. Macy concluded his closing argument by reaffirming Miller’s misstatements of Oklahoma law and by reasserting that any result other than a unanimous verdict would be anathema to the principles underlying our legal system:
[Defense counsel] mentioned that any one of you can control the result in this *735 trial and you can do that legally. But ladies and gentlemen, there is not one chair up there. There’s [sic] 12. Twelve chairs. And there’s [sic] 12 chairs for that purpose. The Constitution of the United States guarantees a person a trial by a jury of his peers, not by one person, by a jury of his peers.
There’s been far too much work go into this case. It’s far too important in this case for someone to play martyr and try to hang it up.
After deliberating for approximately five hours, the jury sent a note to the trial court stating: “We’re 11 to one in favor of the death penalty but one person who refuses to change refers on grounds not related to the law. The 11 request this juror be interviewed and replaced with an alternate.” The trial court and the parties engaged in a colloquy as to how to best respond to the jury’s note. Defense counsel requested an instruction to the jury consistent with OUJI-CR 4-83, the Oklahoma Uniform Jury Instruction specifically applicable to deadlocked death-penalty deliberations: “If, on further deliberation you are unable to agree unanimously as to punishment, I shall discharge you and impose a sentence of imprisonment for life without the possibility of parole or imprisonment for life with the possibility of parole.” The prosecution objected to instructing the jury pursuant to OUJI-CR 4-83, not on its content but on its timing. The prosecution asserted the instruction was an Allen charge and it was too early in deliberations to give the jury such a charge. The trial court rejected defense counsel’s request and instructed the jury as follows: “Ladies and gentlemen of the jury, the law does not authorize me to grant your request. Please continue with your deliberation.”
Within ten minutes the jury returned a note saying “We are unable to reach any unanimous sentence.” Defense counsel immediately moved for a mistrial, noting (1) the jury’s first note demonstrated it was operating under a misunderstanding of the law and (2) the short time-frame between the trial court’s answer to the first note and the jury’s assertion of deadlock demonstrated further deliberations would not be fruitful. The trial court overruled Hooks’s motion for a mistrial on the grounds the jury had not deliberated long enough to justify such a request and stated it would give the Allen charge set out OUJI-CR 10-11. OUJI-CR 10-11 is the Oklahoma uniform Allen charge applicable to juries deadlocked during guilt-phase deliberations. Defense counsel objected to instructing the jury consistent with OUJICR 10-11, asserting that instruction failed to “fully explain the sentencing phase of a death penalty case.” The trial court overruled defense counsel’s objection, refused defense counsel’s request to ask jurors whether further deliberation would be helpful before giving the Allen charge, and instructed the jury consistent with OUJICR 10-11. [18]
*736 At approximately 7:30 p.m., the jury sent out a note asking for its evening break. The trial court and the parties quickly realized the jurors expected to go home for the evening, as they had during first-stage deliberations. Both defense counsel and the prosecution objected to breaking sequestration during second stage deliberations. The trial court had the jury returned to the courtroom and instructed the jurors they were being sent for a dinner break and should “plan to commence with your deliberations when you do return.”
While the jury was away for dinner, the trial court reserved a motel in case jurors wanted to break for the evening. After the jury returned from dinner, the court met with counsel and proposed telling the jurors about logistical considerations relating to the jury’s choice to take a break from deliberations for the evening. In particular, the trial court proposed telling the jury that if it wanted to take an evening break, it must tell the court by 10:30 p.m. so that rooms could be secured for the evening. Defense counsel requested that the trial court first ask the jury whether further deliberations would be helpful before discussing with the jury the logistics of an overnight hotel stay. The trial court denied defense counsel’s request and proceeded to instruct the jury that if it wanted to take an evening break it must inform the court by 10:30 p.m. At no point did the trial court tell the jury its deliberations would not continue indefinitely. Forty minutes later the jury returned a unanimous death sentence.

2. Oklahoma Appellate Proceedings

On direct appeal, Hooks alleged that the combination of circumstances cataloged above coerced the jury into returning a death sentence. Hooks, 19 P.3d at 309. Despite recognizing multiple errors on the part of the trial court and misconduct on the part of both Miller and Macy, the OCCA denied relief. Id. at 310-12, 314-16. The author of the majority opinion, Judge Chapel, would have granted Hooks relief on the basis that the “dangerous combination” of “egregious errors” “may have encouraged and perpetuated any ju *737 rors’ misunderstanding of the law.” Id. at 312 nn. 33, 36. Because Judge Chapel’s colleagues “unanimously disagree[d] with [him] as to [the] matter,” he “yield[ed] to their collective wisdom” and wrote the opinion to affirm. Id. at 312 n. 36. Thus, some portions of the opinion of the OCCA on direct appeal reflect only the views of Judge Chapel, while some portions reflect the views of the court.[19]
The OCCA first took up Hooks’s challenge to the way the trial court informed the jury it would be sequestered until the end of deliberations. Id. at 310. In particular, Hooks asserted that under all the circumstances, the trial court’s logistics discussion with the jury “suggested jurors could not leave until they had a unanimous verdict” and thereby “put unbearable pressure on the holdout juror.” Id. Although it recognized the inference “that the quick return of a verdict after this instruction suggests coercion,” the OCCA rejected such an inference because every statement of the trial court during the logistics discussion amounted to an “accurate statement of law.” Id.
The OCCA recognized that the trial court erred when, prior to releasing the jury for further deliberations after dinner, it failed to admonish jurors not to abandon their honestly held beliefs. Id. at 310 & n. 25 (citing Lowenfteld for proposition that such an instruction lessens coercion on holdout jurors); see also id. at 310 (“Under those circumstances the trial court had a duty to ensure each juror understood his or her obligation to hold fast to firm convictions, and not to concur in a finding or verdict simply to reach a unanimous decision.”). The OCCA concluded, however, that this error did not require reversal because (1) none of the trial court’s other after-dinner instructions were improper; (2) “Hooks’s jury had received a proper Allen instruction,[20] including the admonition at issue, within the preceding two or three hours”; and (3) “[t]here were no intervening substantive communications or instructions between the Allen instruction and the after-dinner exchange.” Id. at 310.
The OCCA likewise agreed with Hooks that the trial court erred when it gave the
*738 Allen instruction set out in OUJI-CR 10-11, instead of the capital deadlock instruction set out in OUJI-CR 4-83. Id. at 310-11. It cursorily denied relief on the basis of this error, however, simply noting as follows:
We continue to hold that an Allen instruction, while no longer the appropriate instruction under these circumstances, is not per se error in the second stage of a capital case. The trial court gave the correct Allen instruction. We have already determined that the trial court’s actions were not inherently or explicitly coercive.
Id. at 312.
The OCCA rejected Hooks’s contention that the jury’s initial note to the court, the note requesting removal of a juror who refused to vote with the majority, indicated a misunderstanding of the law which should have been remedied by an instruction similar to OUJI-CR 4-83. Id. The OCCA noted it was “troubled by the suggestion that the jury believed Oklahoma law required imposition of the death penalty.” Id. It nevertheless concluded Hooks’s assertion of error failed because the jury was properly instructed as to both the eligibility and selection phases of death-penalty deliberations.[21] Id.
Finally, the OCCA agreed with Hooks’s contention that the prosecutors misstated the law in an attempt to “diminish[ ] the jury’s individual sense of morality and mercy.” Id. at 316. In particular, the OCCA noted Miller and Macy had misstated the law in three key ways:
First, all twelve jurors do not have to unanimously agree in capital sentencing proceedings. Second, the failure to agree does not amount to jury nullification. Oklahoma law specifically provides that the jury may not reach a unanimous verdict. As the law provides for this result, failure to agree cannot be said to impede or obstruct it. Third, deadlocked juries are instructed not to abandon their honestly held convictions or concur in a verdict which they cannot in good conscience accept ... while attempting to resolve their differences. The closing arguments complained of here suggest jurors should in fact abandon their honestly held beliefs if those beliefs will result in a less than unanimous verdict.
Id. (footnote omitted). Ultimately, however, the OCCA denied relief, simply concluding that “despite these erroneous arguments the jury was deadlocked for several hours. We must conclude that the jurors in this case were not misled.” Id.

3. Federal District Court Habeas Proceedings

The district court concluded Hooks was not entitled habeas relief because the OCCA’s resolution of his jury-coercion claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent. In analyzing the Allen charge, the district court utilized the four factors identified by this court in United States v. Arney, 248 F.3d *739 984, 988 (10th Cir.2001)[22]: “(1) the language of the instruction, (2) whether the instruction is presented with other instructions, (3) the timing of the instruction, and (4) the length of the jury’s subsequent deliberations.”
The district court noted the trial court’s instruction was a “modified” Allen charge, a supplemental instruction in which the court asks all jurors, rather than only those in the minority, to carefully consider their views. See Gilbert v. Mullin, 302 F.3d 1166, 1173-74 (10th Cir.2002) (discussing how “modified” Allen charge differs from “traditional” Allen charge). Such instructions generally do not “unduly emphasize the importance of reaching a verdict.” Id. at 1174. Thus, the district court concluded the language of the Allen charge itself was not coercive.
The district court recognized the jury was presented with many instructions discussing unanimity, but was presented with no instruction indicating unanimity was not required as to the ultimate sentence imposed or the consequences if the jury was unable to reach unanimity. Nevertheless, the district court relied on precedent indicating the Eighth Amendment does not require a trial court to instruct the jury on the consequences of their failure to agree. See Neill v. Gibson, 278 F.3d 1044, 1053-54 (10th Cir.2001) (discussing Eighth Amendment implications of failing to instruct jury on consequences of not reaching a unanimous verdict during penalty phase of capital trial). Furthermore, according to the district court, Hooks’s trial counsel argued to the jury during closing arguments that the jury did not have to be unanimous and that if one or more jurors held out death would not be imposed.[23] Thus, according to the district court, the OCCA’s determination that the instructions as a whole did not coerce the jury was not an unreasonable application of Lowenfield.
As to the timing of the Allen instruction, the district court simply noted that prior to the giving of the charge, the jury had not absolutely declared further deliberations would be fruitless. Furthermore, the instruction was given in the afternoon, rather than late at night. According to the district court, there was nothing in the timing of the Allen charge that rendered it coercive. The district court did not, however, recognize that the Allen instruction was given soon after the second jury note indicating an inability to reach a unanimous verdict and after the request of Hooks’s counsel to inquire of the jury whether further deliberations would be meaningful.
Finally, the district court acknowledged that the jury deliberated for approximately two and one-half hours after receiving the Allen charge before returning a verdict. Citing several cases from this court, the district court concluded that substantial time gap weighed against Hooks’s jury-coercion argument.
In conclusion, the district court stated:
*740 Considering the totality of the circumstances in which the Allen charge was given in [Hooks’s] case, the Court concludes that it was not coercive in such a way as to deny him a fair trial and due process of law. The OCCA’s determination that [Hooks] was not entitled to relief is neither contrary to, nor an unreasonable application of, clearly established federal law.

C. Analysis

1. AEDPA Deference

Hooks asserts the trial court’s Allen instruction, “in its context and under all the circumstances,” was so coercive as to deny him a reliable sentencing proceeding. Lowenfield, 484 U.S. at 237, 108 S.Ct. 546 (quotation omitted). He further argues this court should review his jury coercion claim de novo because the OCCA’s compartmentalized adjudication of the claim is contrary to Lowenfield. See Brown v. Uphoff 381 F.3d 1219, 1225 (10th Cir.2004) (holding that when a state court adjudication is contrary to clearly established Supreme Court precedent, this court must review de novo whether petitioner is entitled to habeas relief). In the alternative, Hooks argues the record-based indicia of coercion are so overwhelming that the OCCA’s refusal to grant relief on this issue amounts to an unreasonable application of Lowenfield. 28 U.S.C. § 2254(d)(1).
Hooks asserts that in contrast to Lowenfield’s clear direction to review the coerciveness of an Allen charge under the totality of the circumstances, 484 U.S. at 237, 108 S.Ct. 546, the OCCA reviewed the factors bearing on this question individually and in isolation. Oklahoma, on the other hand, asserts the OCCA used a totality-of-the-circumstances test consistent with Lowenfield, relying on footnote 33 of the OCCA’s opinion. See Hooks, 19 P.3d at 312 n. 33. The problem with Oklahoma’s assertion, of course, is that footnote 33 of the OCCA’s opinion represents only the views of Judge Chapel. Id. (“I note the errors in instruction were exacerbated by the egregious errors in argument discussed in Proposition II [involving prosecutorial misconduct], I believe this dangerous combination warrants relief.”); see also supra Section V.B.2 (discussing unusual nature of OCCA opinion, in which the author of the opinion dissented from the outcome on this issue in a series of footnotes).
It is certainly true that Judge Chapel considered the coerciveness of the Allen charge given during the penalty phase in light of all the surrounding circumstances. Hooks, 19 P.3d at 312 nn. 33 & 36, 314 n. 51, 317 n. 57, 318 n. 68. Whether the OCCA majority undertook to analyze Hooks’s claim in a manner consistent with Lowenfield cannot be definitively determined from the opinion. Although the opinion of the OCCA cites to Lowenfield in two footnotes, it does so only to briefly note (1) a quick return of a verdict following an Allen charge can indicate coercion, (2) an instruction to a deadlocked jury not to surrender honestly held beliefs reduces coercion, and (3) a jury instruction as to the consequences of failing to reach unanimity reduces coercion. Hooks, 19 P.3d at 310 & n. 24; Id. at 310 n. 25. But cf. Early v. Packer, 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (per curiam) (holding AEDPA’s “contrary to” clause “does not require citation of our cases— indeed, it does not even require awareness of our eases, so long as neither the reasoning nor the result of the state-court decision contradicts them”). Nowhere does the OCCA indicate it is evaluating the coerciveness of the Allen charge given at Hooks’s trial by reference to all surrounding circumstances. But cf. id. at 9, 123 S.Ct. 362 (“Compliance with Lowen *741 field ... does not demand a formulary statement that the trial court’s actions and inactions were noncoercive ‘individually and cumulatively.’ It suffices that that was the fair import of the [state court] opinion.”). Nor does the “fair import” of the OCCA opinion indicate the court undertook such a highly contextualized analysis. Id.; cf. infra Section V.C.2.b. (discussing OCCA’s compartmentalized analysis of Miller’s and Macy’s prosecutorial misconduct).
There are, however, indications the OCCA aggregated all “errors” in deciding this (possibly distinct) question: Was Hooks afforded a fundamentally fair sentencing proceeding? Hooks, 19 P.3d at 318 (“[W]e find the combination of errors [surrounding the Allen charge] did not infect the ... sentencing proceeding with unfairness, and does not require relief.”); see also id. at 312 n. 36 (stating that although Judge Chapel thought the constellation of errors surrounding the trial court’s Allen charge required relief, his “colleagues ... unanimously disagree[d]”); id. at 314 n. 51 (same). The OCCA’s “combination of errors,” however, excludes other relevant contextual circumstances, such as the timing of the Allen instruction, the significance of the jury notes, and the impact of the trial court’s decision to give the instruction to an apparently deadlocked jury. Whether the limited analysis set out in the text of the OCCA opinion is consistent with Lowenfield’s “coercion” analysis is problematic. Cf. Fry v. Pliler, 551 U.S. 112, 127 S.Ct. 2321, 2325 n. 1, 168 L.Ed.2d 16 (2007) (assuming state court determination of “ ‘no possible prejudice’ ” did not amount to an application of the harmless-beyond-a-reasonable-doubt standard set out in Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)).
Unfortunately, neither party has directed this court to any relevant precedent on that question. Likewise, it is impossible to tell from Judge Chapel’s footnotes the exact basis upon which his colleagues disagreed with him, i.e., the mode of his analysis or his conclusion. Ultimately, because Hooks is entitled to habeas relief even under AEDPA’s deferential review for objective reasonableness, we decline to resolve the very difficult question of whether the analysis of the OCCA is “contrary to” Lowenfield. Accordingly, this court proceeds to the question whether the OCCA’s denial of relief on Hooks’s claim his death sentences were coerced is an unreasonable application of the general standard set out in Lowenfield.

2. Discussion

This court approaches the OCCA decision fully cognizant of the limited nature of federal habeas review under the provisions of AEDPA. See supra Section III. (explicating § 2254(d)(l)’s review standards). The deference accorded that decision, however, is not abject, and the record in this case so overwhelmingly demonstrates the jury’s death sentences were coerced that the OCCA’s contrary decision is not just wrong, it is unreasonable. See Snow, 474 F.3d at 696 (noting that despite § 2254(d)’s high standard, it does not require “abject deference” on the part of this court); McLuckie, 337 F.3d at 1197 (noting this court cannot grant habeas relief unless the relevant state court decision is both wrong and objectively unreasonable). As set out inore fully below, the record in this case reveals an ever-rising tide of coercion ultimately resulting in five unanimous death sentences. From the initial jury instructions, focused narrowly on the concept of unanimity; to misconduct on the part of the prosecutors, designed to mislead the jury about its role in the sentencing process and the need for unanimity; to the *742 note from the jury singling out a lone juror as operating outside the law by refusing to concur in a death verdict, a note demonstrating the jury’s misunderstanding of law consistent with the prosecutors’ misleading closing arguments; to the trial court’s unadorned response that it lacked the power to remove the lone dissenting juror, a response failing in any way to correct the jury’s express misunderstanding of its role in the sentencing process; to the trial court’s guilt-phase-focused Allen charge, reinforcing the need for unanimity so the “case may be completed”; to the trial court’s discussion with the jury, undertaken in response to the jury’s wish to return home for the evening, informing the jury its only options were to deliberate into the night or return to deliberate in the morning after spending the night at a hotel, the record in this case so indicates jury coercion that it was an unreasonable application of Lowenfield for the OCCA to deny Hooks relief.

a. Initial Second Stage Jury Instructions

Placing the Allen charge in context, as required by Lowenfield, begins by recognizing that the relevant instructions given by the trial court prior to closing arguments exclusively discussed the concept of unanimity, even with regard to the possible non-death sentences. For example, Instruction Number 14 stated as follows:
In the event you assess the death penalty, your verdict must be unanimous. You may also return a unanimous verdict of imprisonment for life without the possibility of parole or imprisonment for life with the possibility of parole. When you have reached your verdict, all of you in a body must return it into open court.
There is, however, no discussion in the instructions of the effect of the jury failing to reach a unanimous verdict. This court certainly recognizes that such an instruction is required only in unusual circumstances. See Jones v. United States, 527 U.S. 373, 381-82, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999) (holding Eighth Amendment does not require trial courts to instruct jury on consequences of failure to agree on sentence, unless to fail to do so would affirmatively mislead the jury regarding its role in the sentencing process). Nevertheless, the failure to so inform the jury is certainly one of the contextual circumstances bearing on the question of jury coercion in this particular case. Lowenfield, 484 U.S. at 234, 108 S.Ct. 546 (recognizing that before the case was submitted to the jury, the trial court “charged the jury that if it were unable to reach a unanimous recommendation, the court would impose a sentence of life imprisonment without the possibility of parole”); Darks v. Mullin, 327 F.3d 1001, 1014 (10th Cir.2003) (noting inclusion of language consistent with Okla. Stat. Ann. tit. 21, § 701.11 reduces possibility of coercion flowing from Allen charge). The absence of such an instruction is particularly meaningful in this case given the prosecutorial misconduct — misrepresenting the jury’s duty under Oklahoma law to reach a unanimous verdict — that occurred immediately after the initial penalty-phase instructions. Jones, 527 U.S. at 381-82, 119 S.Ct. 2090.

b. Prosecutorial Misconduct

The concluding line of the trial court’s penalty-phase instructions admonished the jury as follows: “The law provides that you shall now listen to and consider the further arguments of attorneys.” The prosecutors, Miller and Macy, then immediately proceeded to mislead the jury as to its role in sentencing by informing jurors (1) the jury’s work would be wasted if it failed to reach a unanimous verdict, (2) defense counsel’s argument that it took the vote of only one juror to *743 prevent imposition of the death penalty constituted a request for “jury nullification,” and (3) failure to deliberate in a manner leading to a unanimous verdict would amount to operating outside the law. Hooks, 19 P.3d at 316.[24] Thus, immediately following the jury instructions, which spoke only of unanimity, the prosecutors engaged in intentional misconduct designed to misinform the jurors that it is improper for individual jurors to holdout against a majority vote and thereby prevent a unanimous verdict.[25] There is no doubt the intentional misconduct on the part of Miller and Macy violated Hooks’s constitutional rights.
The Supreme Court has held that “the jury must not be misled regarding the role it plays in the sentencing decision.” Romano v. Oklahoma, 512 U.S. 1, 8, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994); see also id. at 9, 114 S.Ct. 2004 (noting that to establish an Eighth Amendment violation, “a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law” (quotation omitted)); Caldwell v. Mississippi 472 U.S. 320, 340, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) (applying heightened review to prosecutorial misconduct because prosecutor sought to mislead jury about “its role in the capital sentencing procedure”). More specifically, the Court has likewise indicated that misstatements to the jury regarding the consequences of deadlock “could give rise to an Eight *744 Amendment problem.” Jones, 527 U.S. at 381-82, 119 S.Ct. 2090. This court recently applied Jones in a context analogous to the case at hand. See Neill, 278 F.3d at 1053-54.
In Neill, the petitioner asserted the trial court’s failure to instruct the jury on the consequences of deadlock deprived him of his Eighth Amendment rights. Id. at 1053. Key to the petitioner’s claim was the following isolated misstatement of Oklahoma law on the part of the prosecutor during his closing argument: if the jury was unable to reach a unanimous verdict, the result would be a retrial. Id. In rejecting the petitioner’s Eighth Amendment claim, this court noted that following this isolated misstatement, the prosecutor correctly stated “that if defense counsel could get one juror to vote against the death penalty, that punishment could not be imposed.” Id. Furthermore, in the defense’s closing argument, petitioner’s counsel accurately informed the jury that if a single juror refused to vote for death, the trial court would declare a deadlock and impose a life sentence. Id. Finally, in the concluding segment of his closing argument, the prosecutor again correctly noted there could be no “mistrial” at sentencing and if a single juror opposed the death penalty, the petitioner would receive a life sentence. Id. Not surprisingly, in light of that record, this court concluded “the prosecutor’s single misstatement did not mislead the jury concerning its sentencing role. An instruction on the consequences resulting from the jury’s failure to reach a unanimous sentencing decision, therefore, was unnecessary.” Id. at 1053-54 (citing Jones, 527 U.S. at 381-82, 119 S.Ct. 2090).[26]
Unlike the case in Neill, the prosecutors here engaged in wholesale and repeated attempts to mislead the jury as to its sentencing role under Oklahoma law. The OCCA specifically held that Miller’s and Macy’s remarks were wholly inconsistent with Oklahoma law. Hooks, 19 P.3d at 316; supra n. 23 (setting forth OCCA’s conclusion that Miller and Macy misstated Oklahoma law regarding the jury’s sentencing role in three key particulars). Thus, it seems apparent Miller’s and Macy’s misconduct invaded Hooks’s Eighth Amendment rights by suggesting “jurors should in fact abandon their honestly held beliefs if those beliefs will result in a less than unanimous verdict.” Hooks, 19 P.3d at 316. By “improperly describing the role assigned to the jury by local law,” the prosecutors thereby caused the jury to “feel less responsible than it should for the sentencing decision.” Romano, 512 U.S. at 9, 114 S.Ct. 2004 (quotations omitted).
*745 Nevertheless, the OCCA denied relief on this ground, holding as follows: “[DJespite [the prosecutors’] erroneous arguments the jury was deadlocked for several hours. We must conclude the jurors were not misled.” Hooks, 19 P.3d at 316. That ruling amounts to “an unreasonable determination of the facts in light of the evidence presented” during the penalty phase of Hooks’s trial. 28 U.S.C. § 2254(d)(2).[27] The mere fact the jury remained deadlocked for “several hours” after the misconduct says very little about the misconduct’s impact. The record simply reveals that one single juror was unconvinced, at least for a period of time, to abandon her honestly held beliefs in order for the jury to reach unanimity. The passage of time does not rule out the possibility that other jurors also favored a life sentence, but acquiesced in a death sentence because they believed holding out would amount to, in the words of Miller, “impeding or attempting to prevent the operation or enforcement of the law.”
More importantly, unlike in Neill, the record contains a singularly clear indication Miller’s and Macy’s misconduct did, in fact, mislead the jury. After deliberating for several hours, the jury sent a note to the trial court indicating as follows: (1) it was eleven to one in favor of imposing the death penalty; (2) the sole holdout juror refused to change her vote “on grounds not related to the law,” and (3) the eleven jurors favoring death unanimously requested the trial court to remove the holdout juror and replace her with an alternate. Hooks, 19 P.3d at 308, 312. A review of the entire state court record indicates that the assertion in the jury note flowed directly from the prosecutors’ misconduct. There is a complete absence from the trial transcript of any other basis for the jury to conclude unanimity was the overriding obligation of the jury. Thus, this court concludes the OCCA’s determination that the jury was not misled by the prosecutors’ intentional misstatements of *746 law is so at odds with the state court record as to be unreasonable. 28 U.S.C. § 2254(d)(2).[28]
Although Hooks makes a strong argument that he is entitled to habeas relief solely on the basis of Miller’s and Macy’s misconduct,[29] this court need not definitively resolve that question. As set out above, it is clear the prosecutors’ misconduct achieved its intended purpose: the jury was misled to believe it was the obligation of a juror holding a minority opinion to abandon that opinion if it was necessary for the jury to reach a unanimous sentence. The coercion flowing from this misconduct, when combined with coercion flowing from the trial court’s Allen charge, undoubtedly coerced the jury’s death sentences. Accordingly, it is unnecessary to determine whether Miller’s and Macy’s misconduct, standing alone, entitles Hooks to habeas relief.

a The First Jury Note

Beyond verifying the impact of the prosecutorial misconduct, the first jury note has further demonstrative significance to the jury-coercion question. That first jury note, which disclosed the jury’s numerical division and the eleven-to-one majority favoring death, commenced a quickly unfolding series of communications between the jury and the court, culminating in the Allen charge, the incorrect instruction to a dead-locked jury in an Oklahoma capital case.
In response to the jury’s note requesting removal of the sole holdout juror, the trial court consulted with defense counsel and the prosecutors. Defense counsel immediately argued the trial court should dispel the jury’s misunderstanding about the legality of a juror refusing to vote for the death penalty by giving the jury the appropriate capital deadlock instruction in OUJI-CR 4-83, informing the jury the *747 court would impose a life sentence should it remain unable to reach a unanimous verdict. Cf. Lowenfield, 484 U.S. at 240, 108 S.Ct. 546 (noting petitioner’s failure to object to state court’s jury poll “indicates that the potential for coercion argued [on appeal] was not apparent to one on the spot”). The trial court overruled defense counsel’s request and simply informed the jury it lacked the power to remedy the situation: “Ladies and gentlemen of the jury, the law does not authorize me to grant your request. Please continue with your deliberations.”
The trial court’s failure to rectify the jury’s misunderstanding, by giving Oklahoma’s capital deadlock instruction as requested by defense counsel, ramped up the pressure on the lone holdout juror to capitulate and reach a unanimous verdict. That is, rather than correct the jury’s misunderstanding that the holdout had a legal obligation to abandon her views for the sake of unanimity, the trial court’s message served to heighten the frustrations of the jurors by indicating nothing more than the court was powerless to address the majority jurors’ apparently valid concerns. As indicated by defense counsel’s objection, and under all the circumstances, the coercive nature of the trial court’s handling of the jury’s note was readily apparent at that time. Id.
The jury’s note also contributed to an atmosphere of coercion in other ways. Hooks asserts the jury’s note, which disclosed the panel’s numerical division and that an eleven-to-one majority favored death, further increased the pressure on the holdout juror to accede to the majority’s wishes and change her vote. Id. at 239-41, 108 S.Ct. 546 (recognizing that in certain circumstances, polling of the jury could be relevant to the question of coercion on habeas review). In the exercise of its supervisory powers over federal courts, the Supreme Court has set out a per se rule: inquiry by a court into a jury’s numerical division is so inherently coercive it mandates reversal of a conviction. Brasfield v. United States, 272 U.S. 448, 449-50, 47 S.Ct. 135, 71 L.Ed. 345 (1926). A number of courts have held that Bras-field’ s per se rule applies whether the trial court learns of the jury’s numerical division through polling or through spontaneous disclosure. See, e.g., United States v. Lloyd, 515 F.3d 1297, 1302-03 (D.C.Cir. 2008); Sanders v. Lamarque, 357 F.3d 943, 944 (9th Cir.2004).
Brasfield’s per se rule does not, however, apply in the habeas context. Lowenfield, 484 U.S. at 240 n. 3, 108 S.Ct. 546. Nevertheless, Brasfield is “instructive as to the potential dangers of jury polling.” Id. at 240, 108 S.Ct. 546; Gilbert v. Mullin, 302 F.3d 1166, 1175-76 (10th Cir.2002). In Gilbert, this court concluded a state court’s poll of the jury prior to, and in concert with, the giving of a Allen charge did not coerce the jury because: (1) the poll “garnered only information concerning the numerical division of the jury and carefully avoided eliciting information concerning the direction in which the jury was leaning; (2) the court never learned which specific jurors were in the minority; and (3) the poll did not disclose “the precise numerical division amongst the jurors.” Id. at 1176 & n. 5. In this case, on the other hand, the jury’s note told the court the exact numerical split, the direction the jury was leaning, and that the eleven jurors in the majority believed the holdout was illegally refusing to change her vote. That the trial court gave an Allen charge within a few minutes of the disclosure of the information that there was but one holdout against the death penalty certainly bears on the coerciveness of the Allen charge. Lowenfield, 484 U.S. at 240, 108 S.Ct. 546.

*748
d. The Allen Charge

No more than ten minutes after the trial court told the jury it was without power to replace the holdout juror with an alternate, the jury sent a second note to the trial court indicating it was “unable to reach any unanimous sentence.” At a conference in chambers, the trial court informed the parties it intended to give the Allen charge set out in OUJI-CR 10-11. See supra n. 17 (setting out text of OUJICR 10-11). Macy agreed this was the appropriate course of action. Defense counsel objected to the giving of OUJI-CR 10-11 as inapplicable to the penalty phase of a capital trial and, instead, requested that the trial court give the capital deadlock instruction set out in OUJI-CR 4-83. Lowenfield, 484 U.S. at 240, 108 S.Ct. 546 (noting that presence of defense objection is relevant to appearance of coercion flowing from giving of Allen charge). The trial court overruled defense counsel’s objection and instructed the jury consistent with OUJI-CR 10-11.
On direct appeal, the OCCA concluded the trial court erred in giving OUJI-CR 10-11 to a deadlocked capital jury during penalty-phase deliberations. Hooks, 19 P.3d at 312. It nevertheless concluded the Allen charge actually given was not inherently coercive. Id. Hooks asserts the trial court’s failure to give the correct Oklahoma deadlock instruction weighs heavily in favor of habeas relief. It is clear, however, that “federal habeas corpus relief does not lie for errors of state law.” Estelle v. McGwire, 502 U.S. 62, 67, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) (quotation omitted). Thus, this court’s task is simply to analyze whether the OCCA’s determination — that the Allen charge actually given was not coercive under the totality of the circumstances — is an unreasonable application of Lowenfield. 28 U.S.C. § 2254(d)(1). Hooks is certainly correct to note, however, that the absence of a correct statement to the jury regarding the consequences of failing to reach a unanimous verdict is relevant to the question of the coerciveness of an Allen charge. Lowenfield, 484 U.S. at 234, 108 S.Ct. 546; Darks, 327 F.3d at 1012, 1014.
This court has approved an instruction nearly identical[30] to the one given here. Gilbert, 302 F.3d at 1171-73, 1176 (10th Cir.2002). In Gilbert, this court concluded there was nothing inherently coercive in the language of this type of instruction. Id. at 1174 (citations omitted). In Gilbert, however, the Allen instruction was not given against a backdrop of misconduct on the part of prosecutors intentionally designed to convince the jury that holding out against a majority verdict was an exercise in illegal “jury nullification.” Nor did the Allen instruction in Gilbert follow a note from the jury disclosing its numerical division and asking the trial court to remove a juror because she refused to change her vote to one in favor of the death penalty for a legally illegitimate reason. These contextual facts mandate a different outcome in this case.
*749 Against this background, the language of the Allen charge given in this case, though nearly identical to that approved in Gilbert, cannot be considered non-coercive. In particular, the Allen charge instructed the jury that “[i]f at all possible, you should resolve any differences and come to a common conclusion that this case can be completed.” See supra n. 17 (emphasis added). Thus, the Allen instruction suggested the case against Hooks would not be completed in the absence of unanimity.[31] This suggestion from the trial court itself was a perfect fit with Miller’s and Macy’s improper closing arguments strongly emphasizing that if the jury failed to reach a unanimous verdict the court’s, parties’, and jury’s efforts would be wasted. The prosecutorial misconduct was exacerbated by the trial court’s refusal to give the explanation in OUJI-CR 4-83 that in the event of deadlock, the court would impose a life sentence. Cf. Lowenfield, 484 U.S. at 234, 108 S.Ct. 546 (noting as part of contextual analysis that during initial penalty-phase instructions, trial court informed jury “that if it were unable to reach a unanimous recommendation, the court would impose a sentence of life imprisonment”); Darks, 327 F.3d at 1014 (same). This context caused an otherwise proper Allen instruction to heighten the risks of jury coercion.
For these same reasons, two additional Amey factors also weigh in support of our conclusion the Allen charge coerced the jury into returning death sentences. Gilbert, 302 F.3d at 1173 (examining, as part of Amey analysis, whether the Allen instruction was separated in time from the initial instructions and whether the instruction was given after a jury expressed it was deadlocked). Giving an Allen charge separate from and later than other instructions risks “having the jury give disproportionate weight to the new charge.” Id. at 1174. Likewise, “there is an inherent danger in giving a supplemental instruction to an apparently deadlocked jury.” Id. (quotations omitted).[32] The trial court gave the Allen instruction some four or more hours after the initial penalty-phase instructions. Although this sequence of events is likely to intensify coercion, it alone is not enough to suggest *750 undue coercion. Id. Here, however, the trial court’s Allen charge was given within approximately fifteen minutes of the jury’s disclosure of its predisposition and numerical vote, a request for removal of a juror who refused to change her vote to conform with the majority, and the trial court’s vague response that it was powerless to remove the juror. Most importantly, the record indicates no impetus for the jury’s communications with the court other than Miller’s and Macy’s misleading assertions that lack of unanimity was an unlawful exercise in jury nullification. In this context, it is appropriate to conclude these two Amey factors strongly indicate coercion, and such conclusion is not inconsistent with Gilbert.
Finally, Oklahoma notes the jury’s verdict was rendered almost four and one-half hours after the Allen charge was given by the trial court. Oklahoma argues this fact fully supports the OCCA’s conclusion that the trial court’s Allen instruction did not coerce the jury’s death sentences in this case. See Lowenfield, 484 U.S. at 240, 108 S.Ct. 546 (noting the jury’s return of a verdict soon after the giving of an Allen instruction “suggests the possibility of coercion”). This assertion, however, ignores the subsequent unfolding of significant proceedings in the trial court.
At approximately 7:30 p.m. the jury sent a note to the judge inquiring about breaking for the evening. Hooks, 19 P.3d at 309. At that point, the jury had deliberated for approximately seven hours and thirty minutes. “Everyone realized that the jurors expected to go home, as they had during first stage deliberations,” and be allowed to return in the morning to resume deliberations. Id. The parties, however, agreed the jury should remain sequestered until the conclusion of penalty-phase deliberations. Id. The trial court informed counsel it had reserved hotel rooms for the jury in case jurors desired to break for the evening and proposed informing the jurors of this fact prior to their resumption of deliberations. Id. Although defense counsel did not object to such a course of action in the abstract, he requested that the trial court first inquire of the jurors whether they were at an impasse. Id. The trial court refused. Instead, it informed the jury “motel rooms were reserved should the jurors care to break for the evening and resume deliberations the next day.” Id. The trial court noted “jurors were free to continue deliberations into the night, but needed to decide whether to use the motel rooms by 10:30 p.m.” Id. The trial court finished by informing the jury that until the completion “of this proceeding, I cannot release you to go to your respective dwellings.” Id. Finally, without admonishing the jurors not to abandon their honestly held beliefs, the trial court released the jurors for further deliberations. Id. at 309-10. Forty minutes later, the jury returned a verdict of death on each of the five counts.
The district court’s logistical instructions concerning their further deliberations increased the pressure on the jury to reach a unanimous verdict. No matter their technical accuracy,[33] the clear import of those *751 instructions was that the jury must to continue to deliberate, perhaps indefinitely, either through the night or the next morning after a night of sequestration. Miller and Macy, of course, had previously led the jury to believe that failure to reach a unanimous verdict would result in an enormous waste of judicial resources because the penalty phase would have to be retried. Likewise, the trial court’s Allen charge, preceded immediately by the pointed communications between the jury and the court concerning the holdout juror, significantly amplified the impact of Miller’s and Macy’s misconduct by asking the jury to reach unanimity “that the case could be completed.” See supra n. 17.
Against this backdrop, in response to a note from the jury indicating it would like to return home for an evening break, the trial court simply indicated the jury should continue to deliberate, at its own pace, either into the night or the next morning after being sequestered in a hotel. Hooks, 19 P.3d at 309. It failed to remind the jurors “not to abandon their honestly held beliefs,” id. at 310, and did not provide any signal to the jury that it would be asked to do anything other than deliberate indefinitely until it reached unanimity. Cf. Gilbert, 302 F.3d at 1172, 1175 (noting potential for coercion reduced where trial court informed jury as part of Allen charge that it “was conscious of the hour” and “would like for [the jury] to try one more time”). Instead, the trial court told the jury that if it wanted motel rooms, it had to inform the court by 10:30 that evening. Hooks, 19 P.3d at 309. Thus, the trial court’s logistical instructions heightened an already coercive atmosphere, resulting in the jury returning five death sentences forty minutes later. It is this forty-minute period, rather than the several-hour period following the Allen charge, that is the appropriate focus to measure the likelihood of coercion. In light of all that happened previously, the only reasonable conclusion is that the short time period between the trial court’s discussion with the jury over sequestration and the return of the death sentences strongly indicates the death sentences in this case were coerced. Lowenfield, 484 U.S. at 240, 108 S.Ct. 546.

3. The Dissent

a. AEDPA Deference

The dissent asserts this court’s decision to grant Hooks habeas relief somehow labels the OCCA, the federal district court judge, and the dissenter himself as unreasonable. Dissenting Op. at 756 (“At the risk of joining the OCCA and the district court in being labeled unreasonable in the assessment of Constitutional imperatives in this case, I disagree.”); id. at 767 (“I am not convinced the OCCA, which studiously inquired, has passed beyond the edge of reasonableness.”). This assertion demonstrates a deep and fundamental misunderstanding of the AEDPA’s standard of review. The Supreme Court has made it abundantly clear that AEDPA’s “unreasonable application” prong calls on this court to undertake an objective assessment of the state court decision, not a subjective assessment of the views of the judges on the relevant state court (or, for that matter, the views of individual federal judges).
There remains the task of defining what exactly qualifies as an “unreasonable application” of law under § 2254(d)(1). The Fourth Circuit held in [Green v. French ] that a state-court decision involves an “unreasonable application of ... clearly established Federal *752 law” only if the state court has applied federal law “in a manner that reasonable jurists would all agree is unreasonable.” [143 F.3d 865, 870 (4th Cir.1998) ]. The placement of this additional overlay on the “unreasonable application” clause was erroneous....
Defining an “unreasonable application” by reference to a “reasonable jurist,” however, is of little assistance to the courts that must apply § 2254(d)(1) and, in fact, may be misleading. Stated simply, a federal habeas court making the “unreasonable application” inquiry should ask whether the state court’s application of clearly established federal law was objectively unreasonable. The federal habeas court should not transform the inquiry into a subjective one by resting its determination instead on the simple fact that at least one of the Nation’s jurists has applied the relevant federal law in the same manner the state court did in the habeas petitioner’s case. The “all reasonable jurists” standard would tend to mislead federal habeas courts by focusing their attention on a subjective inquiry rather than on an objective one.
Williams v. Taylor, 529 U.S. 362, 409-10, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Thus, AJEDPA mandates that this court focus only on the decision before the court on habeas review, not on whether the individual judges on the relevant state court are generally reasonable individuals.[34] Likewise, to the extent it asserts this court should deny habeas relief because it and the district court judge disagree with the outcome, the dissent again demonstrates a deep and fundamental misunderstanding of AEDPA’s standard of review. The Williams court specifically rejected such a standard as embodying an improper subjective standard. Id. at 410, 120 S.Ct. 1495 (rejecting Fifth Circuit’s standard which denied habeas relief as long as any one judge on three-judge panel was unwilling to grant habeas relief).
As noted by the Supreme Court, “[t]he term ‘unreasonable’ is no doubt difficult to define.” Id. It is certainly not unusual or untoward that individual members of a panel of judges would reach different conclusions as to the whether a state court decision is an unreasonable application of clearly established federal law. That is particularly true in this difficult case. What is unusual and wrong after Williams is to transform the inquiry into a subjective one, differentiating jurists as “reasonable” and “unreasonable.” In granting Hooks habeas relief, this court is well aware of the costs involved. See Dissenting Op. at 768 (noting difficulties Oklahoma might encounter in attempting to retry the penalty phase of Hooks’s trial). We cannot, however allow that consideration to deflect this court from its duty to grant habeas relief in an appropriate case. *753 See supra note 34 (collecting cases in which the Supreme Court has granted habeas relief under the highly deferential AEDPA standards of review).

b. Meyits

In asserting Hooks is not entitled to habeas relief as to his death sentences, the dissent employs a piece-by-piece analysis, arguing the individual instances of misconduct and error during the penalty phase are insufficient, standing alone, to conclude the OCCA’s resolution of Hooks’s jury coercion claim amounts to an unreasonable application of Loivenfield. Unfortunately, the dissent fails in the end to step back and take a look at the whole. In so doing, the dissent fails to remain true to Lowenfield, which mandates that in resolving the question of whether a jury verdict was coerced, reviewing courts must consider the Allen charge “in its context and under all the circumstances.” 484 U.S. at 237, 108 S.Ct. 546 (quotation omitted).
The bulk of the dissent is directed toward an effort to dilute the importance of the prosecutors’ misstatements regarding jury unanimity and nullification. The dissent asserts those statements were nothing more than, at most, minor misstatements of the law. Dissenting Op. at 759-65. The OCCA certainly does not share the dissent’s characterization of Miller’s and Macy’s conduct during penalty phase closing arguments. Hooks, 19 P.3d at 314 (“Prosecutors ... engaged in egregiously improper argument which we have often condemned.”); id. at 316 (“The closing arguments complained of here suggest jurors should in fact abandon their honestly held beliefs if those beliefs will result in a less than unanimous verdict. These misstatements of law could have deprived Hooks of his right to a properly instructed capital jury, and come close to requiring relief even if the other comments did not render the proceedings as a whole fundamentally unfair.”).[35] The dissent’s weak protestations to the contrary, it simply cannot be debated that the prosecutors’ remarks to the jury regarding jury nullification and the need for unanimity misinformed the jury of its proper role under Oklahoma’s death penalty scheme. Hooks, 19 P.3d at 316.[36]
*754 The dissent’s failure to recognize the import of the prosecutors’ misconduct leads it to similarly minimize additional aspects of the penalty phase indicative of coercion. For instance, the dissent asserts the jury’s note requesting the removal of a juror is minimally probative because it could be related to matters other than the prosecutors’ misstatements of the jury’s role. Dissenting Op. at 766. The dissent engages in pure speculation in asserting there may have been benign explanations for the jury’s request to remove a juror who refused to a death sentence. Id. As noted at length above, however, such speculation is utterly at odds with the record in this case. See swpra at 745. The record reveals one, and only one, concrete basis upon which a majority of the jury could conclude it was improper for a single juror to refuse to acquiesce in a death sentence: Miller’s and Macy’s improper comments on jury unanimity and nullification.
Similarly, in assessing the coercive nature of the trial court’s Allen charge in this particular case, the dissent does not even consider the timing of the charge (no more than ten minutes after the jury asked the court to remove the lone dissenting juror and immediately after a protestation of deadlock) or the fact the jury returned a verdict no more than forty minutes after it was informed it would be sequestered for the evening if it was unable to quickly return a verdict.[37] See supra 748-50. The failure to account for these contextual circumstances in analyzing whether the OCCA’s decision was an unreasonable application of Lowenfield, especially in light of the failings of the dissent identified above, seriously undermines the dissent’s criticism of the decision to grant Hooks habeas relief as to his death sentences.
A Conclusion
This court is precluded from issuing the writ simply because it determines in its independent judgment that the OCCA applied Lowenfield erroneously or incorrectly. McLuckie, 337 F.3d at 1197. “Rather, we must be convinced that the application was also objectively unreasonable.” Id. This, however, is one of those rare cases where the record so clearly and unequivocally demonstrates jury coercion that the OCCA’s contrary conclusion is unreasonable. Cf. Early v. Packer, 537 U.S. 3, 11, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (per curiam) (reversing grant of habeas relief on jury coercion claim because it was reasonable to conclude on the record the jury had not been coerced).
All aspects of the penalty phase, excluding only the presentation of evidence, emphasized the concept of jury unanimity. This emphasis began with the initial penalty-phase instructions and concluded with the Allen charge, the incorrect instruction *755 for a deadlocked jury in an Oklahoma capital case. Sandwiched between the initial instructions and the Allen charge was even more communication about jury unanimity. Miller and Macy engaged in active prosecutorial misconduct that went to the very heart of the jury’s understanding of its role at sentencing. The obvious effect of this misconduct, as demonstrated by the jury’s first note to the trial court, was that the jury believed it was unlawful to maintain an honestly held position if to do so would prevent the jury from reaching a unanimous verdict. The trial court’s Allen charge fifteen minutes later served to seriously exacerbate coercion by failing to inform the jury of the actual sentencing consequences of deadlock. The Allen charge itself magnified the prosecutorial misconduct by reaffirming that the jury should work in earnest to reach a unanimous verdict so the case could be “completed.” Thus the jury, infected with the concept that absent unanimity a retrial would occur and troubled by its lack of unanimity, was never told the trial court would impose a life sentence in the event of deadlock. These facts, when combined with the trial court’s inartful responses to the first note from the jury and the jury’s request to return home for the evening, compel the conclusion the death sentences were coerced and require relief under Lowenfield. This is especially true given the heightened entitlement of a defendant facing the death penalty to an uncoerced verdict of the jury. Lowenfield, 484 U.S. at 241, 108 S.Ct. 546; Kyles v. Whitley, 514 U.S. 419, 422, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (holding a federal habeas court’s “duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case” (quotation omitted)). Failure to grant relief on this record would amount to nothing more than “abject deference” to the decision of the OCCA, something to which no state court is entitled under AEDPA. Snow, 474 F.3d at 696 (quotation omitted).
VI. CONCLUSION
The district court’s denial of habeas relief on the five murder convictions is AFFIRMED. That part of the district court’s order denying habeas relief on the five death sentences is, however, REVERSED. The matter is REMANDED to the district court for the issuance of an order consistent with this opinion.

. Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896). “An Allen charge is a supplemental instruction ... designed to encourage a divided jury to agree on a verdict.” United States v. LaVallee, 439 F.3d 670, 689 (10th Cir.2006) (quotation omitted). Because it can have the effect of “blasting verdicts out of juries,” it is also known as the "dynamite charge.” United States v. Zabriskie, 415 F.3d 1139, 1148 (10th Cir.2005) (quotation omitted).

. Because the district court granted Hooks a certificate of appealability as to each issue raised on appeal, this court has jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253. See Miller-El v. Cockrell, 537 U.S. 322, 336, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003).

. Because he is entitled to habeas relief on this ground, we do not reach any of Hooks’s additional challenges to his death sentences.

. Hooks also sought an evidentiary hearing to develop the factual bases of additional claims of ineffective assistance of trial counsel appearing outside the record on direct appeal. Oída. Stat. tit. 22, ch. 18, App. Rule 3.11(B)(3)(b). He sought to develop claims his counsel failed to (1) investigate and present evidence from police reports; (2) obtain his boots prior to trial; and (3) provide evidence in support of a challenge to the racial composition of the jury venire. The OCCA summarily rejected Hooks’s request for an evidentiary hearing. Hooks v. State, 19 P.3d 294, 317 n. 65 (Okla.Crim.App.2001).

. More than two years after filing his petition, Hooks sought permission to amend it to add additional claims. According to the motion, "recently developed facts [call into question] the strength of the blood evidence offered by the State ... and the ineffectiveness of ... trial counsel for his failure to effectively challenge that evidence.” Oklahoma asserted the district court should deny the motion because the new claims were unexhausted and, thus, subject to an anticipatory procedural bar. See Cummings v. Sirmons, 506 F.3d 1211, 1222-23 (10th Cir.2007). The district court granted Hooks’s motion to amend without addressing Oklahoma's arguments. In its substantive response to the amended petition, Oklahoma contended Hooks's newly asserted claim of ineffective assistance was time barred under § 2244(d) because it did not arise out of the same common core of operative facts as the claims set out in Hooks’s original § 2254 petition. See Mayle v. Felix, 545 U.S. 644, 664, 125 S.Ct. 2562, 162 L.Ed.2d 582 (2005). As set out below, the district court denied the ineffective assistance claim in Hooks’s amended § 2254 habeas petition on the merits, without resolving the statute of limitations or procedural bar defenses advanced by Oklahoma. Cf. 28 U.S.C. § 2254(b)(2) (providing an unexhausted habeas claim can be denied on the merits).

. In the section of his brief relating to guilt-phase ineffective assistance, Hooks summarily asserts trial counsel failed to object to improper prosecutorial comments. Rather than identifying the comments at issue, Hooks directs this court to the grounds for relief in Proposition I of his appellate brief. Each of the prosecutorial comments identified in Proposition I, however, relates to the penalty phase. Accordingly, this court does not consider this contention in resolving Hooks’s claims of ineffective assistance during the guilt phase of trial.

. The OCCA's analysis is as follows:
When Hooks took the stand counsel made sure the jury knew Hooks had prior convictions for rape and assault with intent to commit bodily harm. Hooks now complains this trial strategy was unreasonable. He suggests counsel should first have moved the trial court to rule these prior convictions unavailable for impeachment purposes. Prior convictions may be used to impeach a witness. In ruling on their admissibility the court must consider (1) their impeachment value; (2) the time of the convictions and the defendant's subsequent history; (3) the similarity between the prior and charged crimes; (4) the importance of the defendant's testimony; and (5) whether credibility is central to the trial. We disagree with Hooks's claim that the prior offenses were so similar to the charged crime of murder as to automatically prejudice the jury against him. Hooks's prior convictions were relevant for impeachment purposes and admissible, and their probative value for impeachment was not outweighed by the danger of prejudice. As the prior convictions were admissible and would have been used for impeachment, *726 counsel was not ineffective for omitting to ask the trial court to prohibit the State from using Hooks's priors.
Hooks, 19P.3dat318 (footnotes omitted).

. During the prosecution's cross-examination of Hooks, “Hooks admitted owning two pairs of boots in 1992 — a pair of Army boots and lace-up work boots." Hooks, 19 P.3d at 306. Hooks denied owning "Honchos” boots and testified he left his work boots with his family when he left Oklahoma several months after the murders. Id.

. For instance, trial counsel adduced testimony to the following effect: (1) contrary to procedure, an officer was present at the crime scene in work boots without wearing protective booties; (2) officers never compared the size of the "Honchos” boot print to Hooks's shoe size to see if they matched; and (3) at least one of the individuals who discovered the bodies of the victims most likely entered the room where the victims were found and nobody checked the shoe prints of those individuals.

. This claim is suspended in a procedural morass. It was first raised in Hooks's § 2254 petition. Oklahoma responded that the claim was unexhausted. Although it noted Hooks identified the opening statement as indicative of trial counsel's general failure to adequately prepare for trial, the district court did not otherwise analyze the merits of the claim or address whether it was exhausted. The district court’s approach is understandable. As set out above, Hooks's habeas filings embrace a flawed interpretation of Cronic. He assumes he is entitled to relief if he can demonstrate his counsel’s preparation for trial was inadequate and he can carry that burden by cursorily identifying “examples” of deficient conduct flowing from that inadequate preparation. As previously demonstrated, however, Cronic is not implicated by the facts of this case and Hooks can prevail only by identifying specific errors on the part of counsel amounting to deficient performance and by demonstrating he was prejudiced by those specific errors. In light of Hooks’s approach, it is hardly surprising the district court thought it unnecessary to individually analyze each of the numerous cursorily stated "examples” of inadequate preparation set out in Hooks’s habeas petition.
Before this court, Hooks again raises the issue, this time in a discrete section of his brief. Inexplicably, Oklahoma does not mention this aspect of Hooks's claim in its response brief. We choose not to enter this procedural swamp and, instead, exercise our discretion to bypass complex issues of exhaustion to reject the claim on the merits. Revilla v. Gibson, 283 F.3d 1203, 1211 (10th Cir. 2002). This is an especially appropriate course, as this claim "may be disposed of in straightforward fashion on substantive grounds.” Id.

. For instance, in his cross-examination of Rose Mary Glaze, trial counsel cast doubt on McClain’s testimony she had spent the morning of the murders waiting at Hooks's trailer to see if he would show up. In particular, Glaze testified it was unlikely anyone would approach Hooks’s trailer unless Hooks was there to restrain his dog. During his cross-examination of Kevin Lonnie, trial counsel refuted McClain’s assertion she never again saw Hooks after the murders and discredited the prosecution’s assertion that Hooks abandoned his job after the murders. Furthermore, trial counsel elicited testimony from McClain that she smoked cocaine and consumed alcohol during the relevant time period, left Hooks’s trailer during the relevant time period to drink with Lorenzo Brown, and had a poor memory of the night and morning in question.

. Using State's Exhibit 81, a picture of the crime scene, trial counsel was able to impeach Officer Kent Harrville, by demonstrating that contrary to Harrville’s testimony not all officers used protective booties while present at the crime scene. Trial counsel further developed this evidence during cross-examination of Mike Burke, a homicide detective, when it was revealed he was the investigator pictured in Exhibit 81 without protective booties. Trial counsel also demonstrated investigators had not requested blood samples from all suspects to compare with the blood found at the murder scene. In addition, trial counsel cross-examined Mary Long, a criminalist with the Oklahoma State Bureau of Investigation, about the investigators' failure to conduct DNA tests on sperm found in some of the victims.

. Trial counsel offered evidence during cross-examination of Dr. Larry Balding that there were no substantial gaps in time between the deaths of the five victims.

. Hooks's filings make clear he desired an evidentiary hearing as an avenue for discovery. "The purpose of an evidentiary hearing,” however, "is to resolve conflicting evidence.” Anderson v. Attorney General, 425 F.3d 853, 860 (10th Cir.2005). The Rules Governing Section 2254 Cases in the United States District Court [hereinafter "§ 2254 *731 Rules”] provide mechanisms for discovery and expansion of the record without the necessity of an evidentiary hearing. Rule 6, § 2254 Rules (providing district courts may authorize discovery); Rule 7, § 2254 Rules (providing district courts have discretion to expand the record with letters, documents, exhibits, answers to interrogatories, and affidavits). These rules allow the disposition of some petitions without the expenditure of resources necessitated by an evidentiary hearing. Advisory Committee Notes to Rule 6, § 2254 Rules ("[P]re-hearing discovery may show an evidentiary hearing to be unnecessary, as when there are no disputed issues of law or fact” (quotation omitted)); Advisory Committee Notes to Rule 7, § 2254 Rules (“The purpose [of this rule] is to enable the judge to dispose of some habeas petitions ... without the time and expense required for an evidentiary hearing.”) Thus, where the purpose is to discover evidence creating a genuine issue of fact as to a petitioner's entitlement to habeas relief, the appropriate course is to employ Rules 6 and 7, rather than to request an evidentiary hearing. See United States v. Velarde, 485 F.3d at 553, 559-60 (10th Cir.2007). Of course, the limitations set out in § 2254(e)(2) apply "when expansion of the record is used to achieve the same end as an evidentiary hearing.” Cargle v. Mullin, 317 F.3d 1196, 1209 (10th Cir.2003) (quotation and alteration omitted). Only when a petitioner diligently sought to develop the factual basis of a habeas claim in state court can he utilize the procedures set out in Rules 6 and 7. Id.

. The district court utilized this standard because the OCCA summarily denied Hooks’s request for an evidentiary hearing. See Bryan v. Mullin, 335 F.3d 1207, 1215 (10th Cir. 2003) (en banc) (holding that when a petitioner seeks an evidentiary hearing in state court to develop the factual basis of a claim, but the state court denies such a hearing, entitlement to a federal court hearing is analyzed pursuant to pre-AEDPA law rather than the standards set out in § 2254(e)(2)). Under the particular facts of this case, however, § 2254(e)(2) might indeed operate as a limitation on Hooks's entitlement to an evidentiary hearing. Some aspects of Hooks’s federal habeas claim of ineffective assistance were not embraced in his state-court request for an evidentiary hearing. Nevertheless, because Hooks is not entitled to an evidentiary hearing under any standard, we need not labor over the proper application of § 2254(e)(2) in this case.

. Although we agree with the dissent's assertion that Lowenfield is sufficiently general that this court’s review of the OCCA’s decision should be doubly deferential, we cannot agree with the dissent's unsupported assertion that the standard set out in Lowenfield is somehow less revealing than the standard set out in Strickland. Dissenting Op. at 758-59 & n. 5 ("But unlike Strickland and it’s progeny, which at least provide guidance for its application, Lowenfield establishes nothing more than a general (perhaps merely aspirational) principle without a hint as to how courts are to determine whether a Constitutional violation occurred.” (footnote omitted)). The Supreme Court has made clear that the Strickland standard is purposefully general and context specific:
We established the legal principles that govern claims of ineffective assistance of counsel in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). An ineffective assistance claim has two components: A petitioner must show *733 that counsel’s performance was deficient, and that the deficiency prejudiced the defense. Id., at 687, 104 S.Ct. 2052. To establish deficient performance, a petitioner must demonstrate that counsel’s representation “fell below an objective standard of reasonableness.” Id., at 688, 104 S.Ct. 2052. We have declined to articulate specific guidelines for appropriate attorney conduct and instead have emphasized that “[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms.” Ibid.
Wiggins v. Smith, 539 U.S. 510, 521, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (emphasis added). This general standard has not prevented the Supreme Court from granting habeas relief applying the AEDPA deferential standard in an appropriate case. Id. at 537-38, 123 S.Ct. 2527. Likewise, the rule set out in Lowenfield is necessarily general and context specific, as an otherwise unremarkable Allen charge may be rendered coercive in light of remarkable surrounding circumstances. In contrast to the dissent’s assertion, nothing in either the text of AEDPA or the decisions of the Supreme Court categorically rule out the availability of habeas relief under the rule set out Lowenfield.

. See Tuilaepa v. California, 512 U.S. 967, 971, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994) (describing “eligibility decision” and “selection decision” and noting they together constitute the two phases in death penalty deliberations).

. The instruction given by the trial court in this case, which is virtually identical to the form version of OUJI-CR 10-11, with the exception of the time frames, states as follows:
This case has taken approximately 57 hours of trial-time. You have deliberated for approximately 6 1/2 hours. You report to me that you are experiencing difficulty in arriving at a verdict.
This is an important case and a serious matter to all concerned. You are the exclusive judges of the facts; the court is the judge of the law. Now I most respectfully and earnestly request of you that you return to your jury room and resume your deliberations. Further open and frank discussion of the evidence and law submitted to you in this case may aid you in arriving at a verdict.
*736 This does not mean that those favoring any particular position should surrender their honest convictions as to the weight or effect of any evidence solely because of the opinion of other jurors or because of the importance of arriving at a decision. No juror should ever agree to a verdict that is contrary to the law in the court’s instructions, nor find a fact or concur in a verdict which in good conscience he or she believes to be untrue.
This does mean that you should give respectful consideration to each other’s views and talk over any differences of opinion in the spirit of fairness and candor. If at all possible, you should resolve any differences and come to a common conclusion, that this case may be completed. Each juror should respect the opinion of his or her fellow jurors, as he or she would have them respect his or hers, in an earnest and diligent effort to arrive at a just verdict under the law and the evidence.
You may be as leisurely in your deliberations as the case may require and take all the time necessary. The giving of this instruction at this time in no way means that it is more important than any other instruction. On the contrary, you should consider this instruction together with and as part of the instructions which I previously gave you.
In stating the foregoing, I again repeat: you are the judges of the facts; the court is the judge of the law. In making all statements made to you I have not, nor do I now, express or intimate, nor indicate, in any way the conclusions to be reached by you in this case, nor do I intend in any way or manner to coerce a verdict, nor directly or indirectly to force a verdict in this case. I only ask that you return to your jury room and, again, diligently and earnestly under your oaths resume your deliberations.

. In reflecting his individual views, Judge Chapel opined:
[P]rosecutorial misconduct in the second stage infected the sentencing proceeding with unfairness and deprived Hooks of a fair sentencing hearing. The second stage argument was especially egregious, as the misstatements of law, combined with errors in instruction ..., suggested that a hung jury was somehow illegal. This may have led to a misconception among the majority of Hooks’s jurors.... We have repeatedly condemned the Oklahoma County District Attorney's reliance on improper argument. ... In addition to our warnings, federal reviewing courts have also repeatedly condemned Mr. Macy and prosecutors from his office for their habitual misconduct in argument. This Court has let this flagrant disregard of our rulings pass too long. The second stage argument here contained several comments the prosecutors knew to be error, included for the purpose of inflaming the jury's passions and encouraging a sentencing verdict based on passion or prejudice rather than the evidence. The errors in argument, combined with the errors in instructing the deadlocked jury, prejudiced Hooks’s ability to receive a fair sentencing hearing. I believe the misstatements of law regarding jury nullification deprived Hooks of his right to a properly instructed capital jury, and ought to result in relief even if the other comments did not render the proceedings as a whole fundamentally unfair.
Hoolcs, 19 P.3d at 314 n. 51 (citations omitted); see also id. at 317 n. 57.

. In utilizing this terminology, it is clear the OCCA was simply stating that OUJI-CR 10-11 is, in the abstract, a properly stated Allen instruction, not that it is the proper instruction to give to a jury deadlocked during penalty-phase deliberations. Hooks, 19P.3dat310 (“Hooks claims the trial court erred in refusing to give the capital deadlock instruction, OUJI-CR (2d) 4-83. Hooks is right.”).

. In this regard, the OCCA stated as follows: The jury was accurately instructed that it was authorized to impose the death penalty if it unanimously found one or more aggravating circumstances, and then found that circumstance outweighed any mitigating evidence. Nothing in the instructions suggested the jury was required to impose a death sentence if it found at least one aggravating circumstance. Instruction 11 told the jury it could impose a sentence of life or life without parole even after finding aggravating circumstances outweighed mitigating circumstances.
Hoolcs, 19 P.3d at 312.

. An Amey analysis, though helpful in reviewing a claim of jury coercion in habeas proceedings, is not dispositive under the AED-PA. Gilbert v. Mullin, 302 F.3d 1166, 1173 n. 3 (10th Cir.2002) ("Although Amey sets forth the factors under which a federal appellate court reviews the supplemental jury instructions used by a federal district court, we note that this standard is higher than our more deferential review pursuant to AEDPA.”).

. Based solely on these limited arguments on the part of defense counsel during closing arguments, the district court eliminated from the coercion equation the misconduct on the part of the prosecutors. As set out more fully below, this erroneous legal ruling seriously undermines the district court’s coercion analysis.

. The OCCA summarized Miller and Macy’s clear misstatements of law: (1) juror unanimity is not required in capital sentencing proceedings; (2) the failure to agree is not jury nullification and it does not impede or obstruct enforcement of the law; and (3) jurors are not to abandon honestly held beliefs to avoid a less than unanimous verdict. Hooks, 19 P.3d at 316.

. Footnote 51 of the OCCA’s opinion specifically states that this misconduct was intentional and calculated to mislead the jury. Hooks, 19 P.3d at 314 n. 51 ("The second stage argument here contained several comments the prosecutors knew to be error, included for the purpose of inflaming the jury's passions and encouraging a sentencing verdict based on passion or prejudice rather than the evidence.''). While the bulk of footnote 51 consists of the individual views of Judge Chapel, it is unclear whether this specific view is shared by the majority. The context, extent, and repetition of the second-stage misconduct of Miller and Macy in this case, together with their history of misconduct in death penalty cases, confirms the characterizations set out in footnote 51. "Our past experiences with [these prosecutors] leave us convinced that [their] 'inappropriate' commentary was intentional and calculated.” Duckett v. Mullin, 306 F.3d 982, 993-94 n. 4 (10th Cir.2002) (discussing at length Macy's history of prosecutorial misconduct, including his misconduct in this very case (citing Hooks, 19 P.3d at 314 n. 51)); Paxton v. Ward, 199 F.3d 1197, 1216-18 (10th Cir.1999) (labeling misconduct on the part of Macy as "deceit-full ]”); Douglas v. Workman, 560 F.3d 1156, 1190 (10th Cir.2009) (per curiam) (granting habeas relief on the basis Miller engaged in "deliberate deception of a court and jurors by the presentation of known false evidence” and "took affirmative steps, [after the trial was completed], to cover up” his misconduct). More telling, however, the OCCA itself, a court far more familiar with Macy and the attorneys from his office, has likewise noted the repetitive and recalcitrant nature of the misconduct committed by Macy and his attorneys. Hooks, 19 P.3d at 314 n. 51 (collecting federal habeas cases discussing misconduct); id. at 316-17 & n. 55 (collecting OCCA opinions for proposition that Macy's office consistently ignored OCCA opinions directing that prosecutors stop engaging in improper death-phase arguments). As this court has previously noted, "Macy's persistent misconduct ... has without doubt harmed the reputation of Oklahoma's criminal justice system and left the unenviable legacy of an indelibly tarnished legal career.” Duckett, 306 F.3d at 994. In light of the record in this case, the opinion of the OCCA on direct appeal, and the history of these two prosecutors, the dissent’s efforts to rehabilitate Miller and Macy and minimize their misconduct, Dissenting Op. at 759-65, are wholly unconvincing.

. The district court relied on Neill to conclude Miller’s and Macy's misconduct had no impact on the jury’s penalty-phase deliberations because defense counsel properly described for the jury its role at sentencing during his closing argument. See supra n. 22. Unlike in Neill, however, Miller and Macy made multiple, intentional misstatements to the jury regarding its role at sentencing. As part of that misconduct, Miller anticipated defense counsel’s closing arguments regarding the jury's proper role at sentencing and told the jury defense counsel's arguments amounted to a request for "jury nullification," an illegal practice at odds with the very foundations of this country’s legal system. With this background in mind, it is simply not reasonable to conclude that defense counsel’s brief statements during closing arguments cured any and all ill effects flowing from Miller’s and Macy’s intentional misconduct. This was verified when the jury in this case sent a note to the trial court asserting a single juror was operating at odds with the law by refusing to change her vote to ensure a unanimous verdict. Thus, the district court committed a critical legal error in relying upon Neill and removing from the coercion equation the misconduct on the part of Miller and Macy.

. Both parties identify this determination (i.e., the jury was not misled) as one of fact subject to review under 28 U.S.C. § 2254(d)(2). It is possible, however, that the OCCA was instead expressing that Miller’s and Macy's misconduct was harmless. As set out below, this court concludes it is unnecessary to decide whether Hooks is entitled to habeas relief based solely on the prosecutors’ misconduct because he is entitled to habeas relief on the basis of his Lowenfield claim, a claim that includes as only a part of its calculus the misconduct of Miller and Macy. To be clear, this court’s conclusion that the jury was misled does not, standing alone, entitled Hooks's to habeas relief. Instead, it would be necessary to determine whether that misconduct was harmless under one of the potentially applicable standards of review. See, e.g., Brecht v. Abrahamson, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (Applicable standard of review in habeas "is whether the error had substantial and injurious effect or influence in determining the jury’s verdict. Under this standard, habeas petitioners ... are not entitled to habeas relief based on trial error unless they can establish that it resulted in actual prejudice.” (quotations and citation omitted)); id. at 638 n. 9, 113 S.Ct. 1710 ("Our holding does not foreclose the possibility that in an unusual case, a deliberate and especially egregious error of the trial type, or one that is combined with a pattern of prosecutorial misconduct, might so infect the integrity of the proceeding as to warrant the grant of habeas relief, even if it did not substantially influence the jury’s verdict.”); Duckett, 306 F.3d at 992 ("The Eighth Amendment requires that sentencing procedures in a capital case be evaluated under a heightened standard of reliability. We have therefore held that the standard governing appellate review of closing arguments during the sentencing stage of capital cases is whether the comments might have affected the sentencing decision.” (quotation, alteration, and citation omitted)). Because we do not resolve whether Hooks is entitled to habeas relief solely on the basis of prosecutorial misconduct, we also need not resolve what standard of review would apply should the OCCA’s ruling be considered a determination of harmlessness.

. Surprisingly, in analyzing whether Miller's and Macy's misconduct misled the jury, the OCCA did not consider the jury's note. Hooks, 19 P.3d at 316. This failure to account for the jury's note in its analysis of prosecutorial misconduct most likely flows from the OCCA’s rejection, as "pure speculation,” Hooks's claim that the jury’s note demonstrated it misunderstood its role at sentencing. Id. According to the OCCA, because nothing in the trial court's instructions mandated the imposition of the death penalty, ipso facto, the jury could not have been misinformed about its role. Id. This conclusion, whether one of fact or law, is unreasonable. 28 U.S.C. § 2254(d).
The jury's note made clear at least eleven jurors were operating under a mistaken view of Oklahoma law. Those jurors stated that in refusing to change her vote, the holdout juror was acting in derogation of Oklahoma law. But see Hooks, 19 P.3d at 316 ("[A]U twelve jurors do not have to unanimously agree in capital sentencing proceedings.... [T]he failure to agree does not amount to jury nullification.”). This was precisely the mistaken impression Miller and Macy set about to instill in the jury. The prosecutors argued the jury had a duty to reach a unanimous verdict and if any single juror refused to go along, that juror was engaging in the unlawful practice of "jury nullification.” This misconduct is the one and only record-based explanation for the misunderstanding reflected in the jury’s note.
In light of the record in this case, it would certainly have been reasonable for the OCCA to conclude the jury’s misunderstanding of the law did not flow from the trial court's penalty-phase instructions. The OCCA’s follow-up conclusion, that because the jury’s confusion did not flow from those instructions it did not exist, however, is inconsistent with the state court record. In completely discounting the jury's note from its coercion calculus, the OCCA did not just err, it reached an unreasonable determination in light of the record before it. 28 U.S.C. § 2254(d).

. See Woodson v. North Carolina, 428 U.S. 280, 305, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) (holding the Eighth Amendment requires that sentencing procedures in capital cases be evaluated under a heightened standard of reliability); Coleman v. Brown, 802 F.2d 1227, 1238-39 (10th Cir.1986) (same).

. The only material difference between the Allen instruction in Gilbert and the one at issue here is that the Gilbert instruction asked the jury to “try one more time” to reach a unanimous verdict. Gilbert, 302 F.3d at 1173; id. at 1175 (noting instruction "clearly signaled] to the jury it would not be held indefinitely”). Here, on the other hand, there was nothing to indicate any kind of durational limit on deliberations. Furthermore, as set out more fully below, the discussions between the trial court and the jury regarding lodgings for the night certainly magnified the appearance the trial court expected significant, and perhaps indefinite, additional deliberation. Thus, the otherwise subtle difference between the instruction given in Gilbert and the one given here is not without significance, especially considering the differing contexts.

. The dissent asserts that the remainder of the trial court's Allen charge dissipated any suggestion that only a unanimous verdict would bring the case to "completion.” Dissenting Op. at 767. The problem, of course, is that the language quoted by the dissent merely admonishes jurors to adhere to their honest convictions. It does nothing to dispel the notion, drilled into the jurors by Miller and Macy, that failure to reach unanimity would amount to a gross waste of judicial resources:
[The jury system], it's the best system in the world. And it requires, though, these 12 people, these 12 strangers to come together and collaborate, discuss, make a decision. The system would actually grind to a halt. Think about it. It would grind to a screeching halt if juries didn't come together and do that.
If we couldn’t depend on 12 citizens to come together and go in the same direction, then we would never have a verdict. There would never be a disposition. Defendants] would go back to jail and wait for the next trial and they’d go back to jail and wait for the next trial and no one would ever be acquitted and no one would ever be sent on to the penitentiary.

. These are not per se rules. For instance, "we have regularly approved the giving of supplemental Allen charges during jury deliberations.” Gilbert, 302 F.3d at 1174. This court has also noted a trial court "is not required to accept the judgment of a jury that it is hopelessly deadlocked, and may require it to continue deliberating, so long as the court says nothing coercive to the jury.” Id. (quotation omitted). Nevertheless, consideration of these contextual facts is necessary to resolve the ultimate question whether the trial court's Allen charge coerced the death sentences at issue in this case.

. The OCCA held the trial court’s statement regarding sequestration was "an accurate statement of law — the jury was sequestered and jurors could not be separated until they either reached a verdict or an impasse was declared.” Hoolcs, 19 P.3d at 310. The problem, of course, was that Miller and Macy had actively misled the jury regarding the consequences of the failure to reach unanimity, misinforming the jury it must reach a unanimous sentence reflecting the majority view to prevent the waste of resources that would accompany a retrial. With that misconduct as background, the trial court then consistently refused to accurately instruct the jury that a lack of unanimity would effectively end the *751 case and result in life sentences. Finally, the trial court’s logistical instructions implied that deliberations might very well continue indefinitely.

. If that were the question, no petitioner would ever be entitled to habeas relief. This court has no doubt that the state court judges in Oklahoma, Colorado, Kansas, New Mexico, Wyoming, and Utah are eminently reasonable individuals and that each and every one of them is attempting to do justice in all cases that come before them. Nevertheless, reasonable judges make mistakes sometimes, even big, unreasonable mistakes. In those situations, the Supreme Court has not hesitated to grant habeas relief. See, e.g., Abdul-Kabir v. Quarterman, 550 U.S. 233, 259, 127 S.Ct. 1654, 167 L.Ed.2d 585 (2007) (concluding Texas Court of Criminal Appeals’ resolution of petitioner’s claim was not a reasonable application of Supreme Court precedent); Miller-El v. Dretke, 545 U.S. 231, 265, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005) (concluding Texas state court factual finding was unreasonable); Wiggins v. Smith, 539 U.S. 510, 527, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (holding that the ''Maryland Court of Appeals’ application of Strickland’s governing legal principles was objectively unreasonable”).

. In his dissent, Judge O'Brien asserts the OCCA's unanimous concerns about Miller's and Macy's misconduct were "overwrought.” Dissenting Op. at 765. The irony of the dissent’s assessment speaks for itself. The dissent further asserts that our reading of the prosecutors' statements is "selective.” Dissenting Op. at 759-60. It is the dissent, however, that in trying to rehabilitate the prosecutors' clearly improper comments on jury unanimity and nullification adopts a selective and stilted view of the record. Miller’s and Macy’s improper remarks about jury unanimity and nullification certainly do not stand alone. Hooks, 19 P.3d at 315 (holding prosecutors misstated the law as applied to Oklahoma’s heinous, atrocious, or cruel aggravating circumstances and, additionally, encouraged the jurors to decide the question on the basis or sympathy for the victims); id. (holding prosecutors erroneously argued to the jury the victims were kidnaped, thereby "dangerously skirt[ing] the border of impropriety”); id. at 316-17 (stating that prosecutors, in direct defiance of the directions of the OCCA, had utilized the "infamous 'three hots and a cot' ” argument and had exhorted the jury to " ‘pray if you want to’ ”). Nor can it be debated that Miller’s and Macy’s misconduct was intentional. As detailed at length above, these prosecutors have a long and infamous history of engaging in misconduct. See supra n. 25. The OCCA itself noted that Miller and Macy continued to make improper arguments to the jury in direct contravention to the directions of the OCCA. Hooks, 19 P.3d at 317. A review of the entire record in this case reveals that Miller’s and Macy’s exhortations to the jury that failure to reach unanimity would amount to nothing other than jury nullification was a plain, intentional, and ultimately successful attempt to subvert the jury’s understanding of its proper role during death penalty deliberations.

. The dissent asserts that, in any event, the majority has engaged in "over reading of Supreme Court precedent” by relying on the Supreme Court’s decision in Romano v. Oklahoma, 512 U.S. 1, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994). Dissenting Op. at 763-64 & n. 10. What the dissent fails to acknowledge, however, is the Supreme Court itself has recognized that the principles set out in Romano are implicated when a jury is misled as to the consequences of deadlock. Jones v. United States, 527 U.S. 373, 381-82, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999).

. Instead, the dissent asserts "[tjhere is no reason to think any juror would assume deliberations would be interminable.” Dissenting Op. at 767. In support of this assertion the dissent notes the jury deliberated for thirteen hours during the guilt phase but only eight during the penalty phase. Id. Of course, the guilt phase lasted twelve days, while the penalty phase, including opening and closing arguments, lasted no more than a couple of hours.